## DRAPER *v*. UNITED STATES.

No. 136.   Argued December 11, 1958.—Decided January 26, 1959.

*Osmond K. Fraenkel* argued the cause and filed a brief for petitioner.

*Leonard B. Sand* argued the cause for the United States. On the brief were *Solicitor General Rankin, Assistant Attorney General Anderson, Beatrice Rosenberg* and *Jerome M. Feit.*

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

Petitioner was convicted of knowingly concealing and transporting narcotic drugs in Denver, Colorado, in violation of 35 Stat. 614, as amended, 21 U. S. C. § 174. His conviction was based in part on the use in evidence against him of two "envelopes containing [865 grains of] heroin" and a hypodermic syringe that had been taken from his person, following his arrest, by the arresting officer. Before the trial, he moved to suppress that evidence as having been secured through an unlawful search and seizure. After hearing, the District Court found that the arresting officer had probable cause to arrest petitioner without a warrant and that the subsequent search and seizure were therefore incident to a lawful arrest, and overruled the motion to suppress. 146 F. Supp. 689. At the subsequent trial, that evidence was offered and, over petitioner's renewed objection, was received in evidence, and the trial resulted, as we have said, in petitioner's conviction. The Court of Appeals affirmed the conviction, 248 F. 2d 295, and certiorari was sought on the sole ground that the search and seizure violated the Fourth Amendment [1] and therefore the use of the heroin in evidence vitiated the conviction. We granted the writ to determine that question. 357 U. S. 935.

---

[1] The Fourth Amendment of the Constitution of the United States provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The evidence offered at the hearing on the motion to suppress was not substantially disputed. It established that one Marsh, a federal narcotic agent with 29 years' experience, was stationed at Denver; that one Hereford had been engaged as a "special employee" of the Bureau of Narcotics at Denver for about six months, and from time to time gave information to Marsh regarding violations of the narcotic laws, for which Hereford was paid small sums of money, and that Marsh had always found the information given by Hereford to be accurate and reliable. On September 3, 1956, Hereford told Marsh that James Draper (petitioner) recently had taken up abode at a stated address in Denver and "was peddling narcotics to several addicts" in that city. Four days later, on September 7, Hereford told Marsh "that Draper had gone to Chicago the day before [September 6] by train [and] that he was going to bring back three ounces of heroin [and] that he would return to Denver either on the morning of the 8th of September or the morning of the 9th of September also by train." Hereford also gave Marsh a detailed physical description of Draper and of the clothing he was wearing,[2] and said that he would be carrying "a tan zipper bag," and that he habitually "walked real fast."

On the morning of September 8, Marsh and a Denver police officer went to the Denver Union Station and kept watch over all incoming trains from Chicago, but they did not see anyone fitting the description that Hereford had given. Repeating the process on the morning of September 9, they saw a person, having the exact physical attributes and wearing the precise clothing described by Hereford, alight from an incoming Chicago train and

[2] Hereford told Marsh that Draper was a Negro of light brown complexion, 27 years of age, 5 feet 8 inches tall, weighed about 160 pounds, and that he was wearing a light colored raincoat, brown slacks and black shoes.

start walking "fast" toward the exit. He was carrying a tan zipper bag in his right hand and the left was thrust in his raincoat pocket. Marsh, accompanied by the police officer, overtook, stopped and arrested him. They then searched him and found the two "envelopes containing heroin" clutched in his left hand in his raincoat pocket, and found the syringe in the tan zipper bag. Marsh then took him (petitioner) into custody. Hereford died four days after the arrest and therefore did not testify at the hearing on the motion.

26 U. S. C. (Supp. V) § 7607, added by § 104 (a) of the Narcotic Control Act of 1956, 70 Stat. 570, provides, in pertinent part:

> "The Commissioner . . . and agents, of the Bureau of Narcotics . . . may—
>
> .        .        .        .        .
>
> "(2) make arrests without warrant for violations of any law of the United States relating to narcotic drugs . . . where the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

The crucial question for us then is whether knowledge of the related facts and circumstances gave Marsh "probable cause" within the meaning of the Fourth Amendment, and "reasonable grounds" within the meaning of § 104 (a), *supra*,[3] to believe that petitioner had committed or was committing a violation of the narcotic laws. If it did, the arrest, though without a warrant, was lawful

---

[3] The terms "probable cause" as used in the Fourth Amendment and "reasonable grounds" as used in § 104 (a) of the Narcotic Control Act, 70 Stat. 570, are substantial equivalents of the same meaning. *United States* v. *Walker*, 246 F. 2d 519, 526 (C. A. 7th Cir.); cf. *United States* v. *Bianco*, 189 F. 2d 716, 720 (C. A. 3d Cir.).

and the subsequent search of petitioner's person and the seizure of the found heroin were validly made incident to a lawful arrest, and therefore the motion to suppress was properly overruled and the heroin was competently received in evidence at the trial. *Weeks* v. *United States,* 232 U. S. 383, 392; *Carroll* v. *United States,* 267 U. S. 132, 158; *Agnello* v. *United States,* 269 U. S. 20, 30; *Giordenello* v. *United States,* 357 U. S. 480, 483.

Petitioner does not dispute this analysis of the question for decision. Rather, he contends (1) that the information given by Hereford to Marsh was "hearsay" and, because hearsay is not legally competent evidence in a criminal trial, could not legally have been considered, but should have been put out of mind, by Marsh in assessing whether he had "probable cause" and "reasonable grounds" to arrest petitioner without a warrant, and (2) that, even if hearsay could lawfully have been considered, Marsh's information should be held insufficient to show "probable cause" and "reasonable grounds" to believe that petitioner had violated or was violating the narcotic laws and to justify his arrest without a warrant.

Considering the first contention, we find petitioner entirely in error. *Brinegar* v. *United States,* 338 U. S. 160, 172–173, has settled the question the other way. There, in a similar situation, the convict contended "that the factors relating to inadmissibility of the evidence [for] *purposes of proving guilt at the trial,* deprive[d] the evidence as a whole of sufficiency to show probable cause for the search . . . ." *Id.,* at 172. (Emphasis added.) But this Court, rejecting that contention, said: "[T]he so-called distinction places a wholly unwarranted emphasis upon the criterion of admissibility in evidence, to prove the accused's guilt, of the facts relied upon to show probable cause. That emphasis, we think, goes much too far in confusing and disregarding the difference between what is required to prove guilt in a criminal case and what is

required to show probable cause for arrest or search. It approaches requiring (if it does not in practical effect require) proof sufficient to establish guilt in order to substantiate the existence of probable cause. There is a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them." [4] 338 U. S., at 172–173.

Nor can we agree with petitioner's second contention that Marsh's information was insufficient to show probable cause and reasonable grounds to believe that petitioner had violated or was violating the narcotic laws and to justify his arrest without a warrant. The information given to narcotic agent Marsh by "special em-

---

[4] In *United States* v. *Heitner,* 149 F. 2d 105, 106 (C. A. 2d Cir.), Judge Learned Hand said "It is well settled that an arrest may be made upon hearsay evidence; and indeed, the 'reasonable cause' necessary to support an arrest cannot demand the same strictness of proof as the accused's guilt upon a trial, unless the powers of peace officers are to be so cut down that they cannot possibly perform their duties."

*Grau* v. *United States,* 287 U. S. 124, 128, contains a *dictum* that "A search warrant may issue only upon evidence which would be competent in the trial of the offense before a jury (*Giles* v. *United States,* 284 Fed. 208; *Wagner* v. *United States,* 8 F. (2d) 581) . . . ." But the principles underlying that proposition were thoroughly discredited and rejected in *Brinegar* v. *United States, supra,* 338 U. S., at 172–174, and notes 12 and 13. There are several cases in the federal courts that followed the now discredited *dictum* in the *Grau* case, *Simmons* v. *United States,* 18 F. 2d 85, 88; *Worthington* v. *United States,* 166 F. 2d 557, 564–565; cf. *Reeve* v. *Howe,* 33 F. Supp. 619, 622; *United States* v. *Novero,* 58 F. Supp. 275, 279, but the great weight of authority is the other way. See, *e. g., Wrightson* v. *United States,* 236 F. 2d 672 (C. A. D. C. Cir.); *United States* v. *Heitner, supra* (C. A. 2d Cir.); *United States* v. *Bianco,* 189 F. 2d 716 (C. A. 3d Cir.); *Wisniewski* v. *United States,* 47 F. 2d 825 (C. A. 6th Cir.); *United States* v. *Walker,* 246 F. 2d 519 (C. A. 7th Cir.); *Mueller* v. *Powell,* 203 F. 2d 797 (C. A. 8th Cir.). And see Note, 46 Harv. L. Rev. 1307, 1310–1311, criticizing the *Grau dictum.*

ployee" Hereford may have been hearsay to Marsh, but coming from one employed for that purpose and whose information had always been found accurate and reliable, it is clear that Marsh would have been derelict in his duties had he not pursued it. And when, in pursuing that information, he saw a man, having the exact physical attributes and wearing the precise clothing and carrying the tan zipper bag that Hereford had described, alight from one of the very trains from the very place stated by Hereford and start to walk at a "fast" pace toward the station exit, Marsh had personally verified every facet of the information given him by Hereford except whether petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag. And surely, with every other bit of Hereford's information being thus personally verified, Marsh had "reasonable grounds" to believe that the remaining unverified bit of Hereford's information—that Draper would have the heroin with him—was likewise true.

"In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar* v. *United States, supra,* at 175. Probable cause exists where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *Carroll* v. *United States,* 267 U. S. 132, 162.[5]

---

[5] To the same effect are: *Husty* v. *United States,* 282 U. S. 694, 700–701; *Dumbra* v. *United States,* 268 U. S. 435, 441; *Steele* v. *United States No. 1,* 267 U. S. 498, 504–505; *Stacey* v. *Emery,* 97 U. S. 642, 645; *Brinegar* v. *United States, supra,* at 175, 176.

We believe that, under the facts and circumstances here, Marsh had probable cause and reasonable grounds to believe that petitioner was committing a violation of the laws of the United States relating to narcotic drugs at the time he arrested him. The arrest was therefore lawful, and the subsequent search and seizure, having been made incident to that lawful arrest, were likewise valid.[6] It follows that petitioner's motion to suppress was properly denied and that the seized heroin was competent evidence lawfully received at the trial.

*Affirmed.*

THE CHIEF JUSTICE and MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, dissenting.

Decisions under the Fourth Amendment,[1] taken in the long view, have not given the protection to the citizen which the letter and spirit of the Amendment would seem to require. One reason, I think, is that wherever a culprit is caught red-handed, as in leading Fourth Amendment cases, it is difficult to adopt and enforce a rule that would turn him loose. A rule protective of law-abiding citizens is not apt to flourish where its advocates are usually criminals. Yet the rule we fashion is for the innocent and guilty alike. If the word of the informer

---

[6] *Weeks* v. *United States*, 232 U. S. 383, 392; *Carroll* v. *United States*, 267 U. S. 132, 158; *Agnello* v. *United States*, 269 U. S. 20, 30; *Giordenello* v. *United States*, 357 U. S. 480, 483.

[1] The Fourth Amendment provides:

"The right of the people *to be secure in their persons*, houses, papers, and effects, *against unreasonable* searches and *seizures*, shall not be violated, and no Warrants shall issue, but *upon probable cause*, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (Italics added.)

on which the present arrest was made is sufficient to make the arrest legal, his word would also protect the police who, acting on it, hauled the innocent citizen off to jail.

Of course, the education we receive from mystery stories and television shows teaches that what happened in this case is efficient police work. The police are tipped off that a man carrying narcotics will step off the morning train. A man meeting the precise description does alight from the train. No warrant for his arrest has been—or, as I see it, could then be—obtained. Yet he is arrested; and narcotics are found in his pocket and a syringe in the bag he carried. This is the familiar pattern of crime detection which has been dinned into public consciousness as the correct and efficient one. It is, however, a distorted reflection of the constitutional system under which we are supposed to live.

With all due deference, the arrest made here on the mere word of an informer violated the spirit of the Fourth Amendment and the requirement of the law, 26 U. S. C. (Supp. V) § 7607, governing arrests in narcotics cases. If an arrest is made without a warrant, the offense must be committed in the presence of the officer or the officer must have "reasonable grounds to believe that the person to be arrested has committed or is committing" a violation of the narcotics law. The arresting officers did not have a bit of evidence, known to them and as to which they could take an oath had they gone to a magistrate for a warrant, that petitioner had committed any crime. The arresting officers did not know the grounds on which the informer based his conclusion; nor did they seek to find out what they were. They acted solely on the informer's word. In my view that was not enough.

The rule which permits arrest for felonies, as distinguished from misdemeanors, if there are reasonable grounds for believing a crime has been or is being committed (*Carroll* v. *United States,* 267 U. S. 132, 157),

grew out of the need to protect the public safety by making prompt arrests. *Id.* Yet, apart from those cases where the crime is committed in the presence of the officer, arrests without warrants, like searches without warrants, are the exception, not the rule in our society. Lord Chief Justice Pratt in *Wilkes* v. *Wood,* 19 How. St. Tr. 1153, condemned not only the odious general warrant,[2] in which the name of the citizen to be arrested was left blank, but the whole scheme of seizures and searches [3] under "a discretionary power" of law officers to act "wherever their suspicions may chance to fall"—a practice which he denounced as "totally subversive of the liberty of the subject." *Id.,* at 1167. See III May, Constitutional History of England, c. XI. Wilkes had written in 1762, "To take any man into custody, and deprive him of his liberty, without having some seeming foundation at least, on which to justify such a step, is inconsistent with wisdom and sound policy." The Life and Political Writings of John Wilkes, p. 372.

George III in 1777 pressed for a bill which would allow arrests on suspicion of treason committed in America. The words were "suspected of" treason and it was to these words that Wilkes addressed himself in Parliament. "There is not a syllable in the Bill of the degree of probability attending the *suspicion.* . . . Is it possible, Sir, to give more despotic powers to a bashaw of the Turkish

---

[2] The general warrant was declared illegal by the House of Commons in 1766. See 16 Hansard, Parl. Hist. Eng., 207.

[3] The nameless general warrant was not the only vehicle for intruding on the privacy of the subjects without a valid basis for believing them guilty of offenses. In declaring illegal a warrant to search a plaintiff's house for evidence of libel, issued by the Secretary of State without any proof that the named accused was the author of the alleged libels, Lord Camden said, "we can safely say there is no law in this country to justify the defendants in what they have done; if there was, it would destroy all the comforts of society." *Entick* v. *Carrington,* 2 Wils. K. B. 275, 291.

empire? What security is left for the devoted objects of this Bill against the malice of a prejudiced individual, a wicked magistrate . . . ?" The Speeches of Mr. Wilkes, p. 102.

These words and the complaints against which they were directed were well known on this side of the water. Hamilton wrote about "the practice of arbitrary imprisonments" which he denounced as "the favorite and most formidable instruments of tyranny." The Federalist No. 84. The writs of assistance, against which James Otis proclaimed,[4] were vicious in the same way as the general warrants, since they required no showing of "probable cause" before a magistrate, and since they allowed the police to search on suspicion and without "reasonable grounds" for believing that a crime had been or was being committed. Otis' protest was eloquent; but he lost the case. His speech, however, rallied public opinion. "Then and there," wrote John Adams, "the child Independence was born." 10 Life and Works of John Adams (1856), p. 248.

The attitude of Americans to arrests and searches on suspicion was also greatly influenced by the *lettres de cachet* extensively used in France.[5] This was an order emanating from the King and countersigned by a minister directing the seizure of a person for purposes of immediate imprisonment or exile. The ministers issued the *lettres* in an arbitrary manner, often at the request of the head of a noble family to punish a deviant son or relative. See Mirabeau, A Victim of the Lettres de Cachet, 3 Am. Hist. Rev. 19. One who was so arrested

---

[4] See Quincy's Mass. Rep., 1761–1772, Appendix I, p. 469.

[5] "Experience . . . has taught us that the power [to make arrests, searches and seizures] is one open to abuse. The most notable historical instance of it is that of lettres de cachet. Our Constitution was framed during the seethings of the French Revolution. The thought was to make lettres de cachet impossible with us." *United States* v. *Innelli*, 286 F. 731.

318

might remain incarcerated indefinitely, as no legal process was available by which he could seek release. "Since the action of the government was secret, his friends might not know whither he had vanished, and he might even be ignorant of the cause of his arrest." 8 The Camb. Mod. Hist. 50. In the Eighteenth Century the practice arose of issuing the *lettres* in blank, the name to be filled in by the local mandatory. Thus the King could be told in 1770 "that no citizen of your realm is guaranteed against having his liberty sacrificed to revenge. For no one is great enough to be beyond the hate of some minister, nor small enough to be beyond the hate of some clerk." III Encyc. Soc. Sci. 138. As Blackstone wrote, ". . . if once it were left in the power of any, the highest, magistrate to imprison arbitrarily whomever he or his officers thought proper, (as in France it is daily practiced by the crown,) there would soon be an end of all other rights and immunities." I Commentaries (4th ed. Cooley) *135.

The Virginia Declaration of Rights, adopted June 12, 1776, included the forerunner of the Fourth Amendment: [6]

"That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offence is not particularly described and *supported by evidence,* are grievous and oppressive, and ought not to be granted." (Italics added.)

The requirement that a warrant of arrest be "supported by evidence" was by then deeply rooted in history. And it is inconceivable that in those days, when the right of

_____

[6] See also Maryland Declaration of Rights (1776), Art. XXIII; Massachusetts Constitution (1780), Part First, Art. XIV; New Hampshire Constitution (1784), Part I, Art. XIX; North Carolina Declaration of Rights (1776), Art. XI; Pennsylvania Constitution (1776), Art. X.

privacy was so greatly cherished, the mere word of an informer—such as we have in the present case—would be enough. For whispered charges and accusations, used in lieu of evidence of unlawful acts, were the main complaint of the age. *Frisbie* v. *Butler,* Kirby's Rep. (Conn.) 1785–1788, p. 213, decided in 1787, illustrates, I think, the mood of the day in the matter of arrests on suspicion. A warrant of arrest and search was issued by a justice of the peace on the oath of a citizen who had lost some pork from a cellar, the warrant stating, "said Butler suspects one Benjamin Frisbie, of Harwinton, to be the person that hath taken said pork." The court on appeal reversed the judgment of conviction, holding *inter alia* that the complaint "contained no direct charge of the theft, but only an averment that the defendant was suspected· to be guilty." *Id.,* at 215. Nothing but suspicion is shown in the instant case—suspicion of an informer, not that of the arresting officers. Nor did they seek to obtain from the informer any information on which he based his belief. The arresting officers did not have a bit of *evidence* that the petitioner had committed or was committing a crime before the arrest. The only *evidence* of guilt was provided by the arrest itself.

When the Constitution was up for adoption, objections were made that it contained no Bill of Rights. And Patrick Henry was one who complained in particular that it contained no provision against arbitrary searches and seizures:

> ". . . general warrants, by which an officer may search suspected places, without evidence of the commission of a fact, or seize any person without evidence of his crime, ought to be prohibited. As these are admitted, any man may be seized, any property may be taken, in the most arbitrary manner, without any evidence or reason. Every thing the most sacred

may be searched and ransacked by the strong hand of power. We have infinitely more reason to dread general warrants here than they have in England, because there, if a person be confined, liberty may be quickly obtained by the writ of *habeas corpus*. But here a man living many hundred miles from the judges may get in prison before he can get that writ." I Elliot's Debates 588.

The determination that arrests and searches on mere suspicion would find no place in American law enforcement did not abate following the adoption of a Bill of Rights applicable to the Federal Government. In *Conner v. Commonwealth*, 3 Binn. (Pa.) 38, an arrest warrant issued by a magistrate stating his "strong reason to suspect" that the accused had committed a crime because of "common rumor and report" was held illegal under a constitutional provision identical in relevant part to the Fourth Amendment. "It is true, that by insisting on an oath, felons may sometimes escape. This must have been very well known to the framers of our constitution; but they thought it better that the guilty should sometimes escape, than that every individual should be subject to vexation and oppression." *Id.*, at 43–44. In *Grumon v. Raymond*, 1 Conn. 40, the warrant stated that "several persons are suspected" of stealing some flour which is concealed in Hyatt's house or somewhere else, and ordered the constable to search Hyatt's house or other places and arrest the suspected persons if found with the flour. The court held the warrant void, stating it knew of "no such process as one to arrest all suspected persons, and bring them before a court for trial. It is an idea not to be endured for a moment." *Id.*, at 44. See also *Fisher v. McGirr*, 1 Gray (Mass.) 1; *Lippman v. People*, 175 Ill. 101, 51 N. E. 872; *Somerville v. Richards*, 37 Mich. 299; *Commonwealth v. Dana*, 2 Metc. (Mass.) 329, 335–336.

It was against this long background that Professors Hogan and Snee of Georgetown University recently wrote:

". . . it must be borne in mind that any arrest based on suspicion alone is illegal. This indisputable rule of law has grave implications for a number of traditional police investigative practices. The round-up or dragnet arrest, the arrest on suspicion, for questioning, for investigation or on an open charge all are prohibited by the law. It is undeniable that if those arrests were sanctioned by law, the police would be in a position to investigate a crime and to detect the real culprit much more easily, much more efficiently, much more economically, and with much more dispatch. It is equally true, however, that society cannot confer such power on the police without ripping away much of the fabric of a way of life which seeks to give the maximum of liberty to the individual citizen. The finger of suspicion is a long one. In an individual case it may point to all of a certain race, age group or locale. Commonly it extends to any who have committed similar crimes in the past. Arrest on mere suspicion collides violently with the basic human right of liberty. It can be tolerated only in a society which is willing to concede to its government powers which history and experience teach are the inevitable accoutrements of tyranny." 47 Geo. L. J. 1, 22.

Down to this day our decisions have closely heeded that warning. So far as I can ascertain the mere word of an informer, not bolstered by some evidence [7] that a

---

[7] Hale, who traced the evolution of arrests without warrants in The History of the Pleas of the Crown (1st Am. ed. 1847), states that while officers need at times to act on information from others, they must make that information, so far as they can, their own. He puts a case where A, suspecting B "on reasonable grounds" of being a felon,

crime had been or was being committed, has never been approved by this Court as "reasonable grounds" for making an arrest without a warrant. Whether the act complained of be seizure of goods, search of premises, or the arrest of the citizen, the judicial inquiry has been directed toward the reasonableness of inferences to be drawn from suspicious circumstances attending the action thought to be unlawful. Evidence required to prove guilt is not necessary. But the attendant circumstances must be sufficient to give rise in the mind of the arresting officer at least to inferences of guilt. *Locke* v. *United States,* 7 Cranch 339; *The Thompson,* 3 Wall. 155; *Stacey* v. *Emery,* 97 U. S. 642; *Director General* v. *Kastenbaum,* 263 U. S. 25; *Carroll* v. *United States,* 267 U. S. 132, 159–162; *United States* v. *Di Re,* 332 U. S. 581, 591–592; *Brinegar* v. *United States,* 338 U. S. 160, 165–171.

The requirement that the arresting officer know some facts suggestive of guilt has been variously stated:

> "If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient." *Stacey* v. *Emery, supra,* at 645.

> ". . . good faith is not enough to constitute probable cause. That faith must be grounded on facts within knowledge of the . . . agent, which in the judgment of the court would make his faith reasonable." *Director General* v. *Kastenbaum, supra,* at 28.

asks an officer to arrest B. The duty of the officer was stated as follows:

"He ought to inquire and examine the circumstances and causes of the suspicion of *A*. which tho he cannot do it upon oath, yet such an information may carry over the suspicion even to the constable, whereby it may become his suspicion as well as the suspicion of *A*." *Id.,* at 91.

Even when officers had information far more suggestive of guilt than the word of the informer used here, we have not sustained arrests without a warrant. In *Johnson* v. *United States,* 333 U. S. 10, 16, the arresting officer not only had an informer's tip but he actually smelled opium coming out of a room; and on breaking in found the accused. That arrest was held unlawful. Yet the smell of opium is far more tangible direct evidence than an unverified report that someone is going to commit a crime. And in *United States* v. *Di Re, supra,* an arrest without a warrant of a man sitting in a car, where counterfeit coupons had been found passing between two men, was not justified in absence of any shred of evidence implicating the defendant, a third person. And see *Giacona* v. *State,* 164 Tex. Cr. R. 325, 298 S. W. 2d 587. Yet the evidence before those officers was more potent than the mere word of the informer involved in the present case.

The Court is quite correct in saying that proof of "reasonable grounds" for believing a crime was being committed need not be proof admissible at the trial. It could be inferences from suspicious acts, *e. g.,* consort with known peddlers, the surreptitious passing of a package, an intercepted message suggesting criminal activities, or any number of such events coming to the knowledge of the officer. See *People* v. *Rios,* 46 Cal. 2d 297, 294 P. 2d 39. But, if he takes the law into his own hands and does not seek the protection of a warrant, he must act on some evidence known to him.[8] The law goes far to pro-

---

[8] *United States* v. *Heitner,* 149 F. 2d 105, 106, that says an arrest may be made "upon hearsay evidence" was a case where the arrest was made after the defendant on seeing the officers tried to get away. Our cases cited by that court in support of the use of hearsay were *Carroll* v. *United States,* 267 U. S. 132; *Dumbra* v. *United States,* 268 U. S. 435; and *Husty* v. *United States,* 282 U. S. 694. But each of them was a case where the information on which the arrest was made, though perhaps not competent at the trial, was known to the arresting officer.

tect the citizen. Even suspicious acts observed by the officers may be as consistent with innocence as with guilt. That is not enough, for even the guilty may not be implicated on suspicion alone. *Baumboy* v. *United States,* 24 F. 2d 512. The reason is, as I have said, that the standard set by the Constitution and by the statute is one that will protect both the officer and the citizen. For if the officer acts with "probable cause" or on "reasonable grounds," he is protected even though the citizen is innocent.[9] This important requirement should be strictly enforced, lest the whole process of arrest revert once more to whispered accusations by people. When we lower the guards as we do today, we risk making the role of the informer—odious in our history—once more supreme. I think the correct rule was stated in *Poldo* v. *United States,* 55 F. 2d 866, 869. "Mere suspicion is not enough; there must be circumstances represented to the officers through the testimony of their senses sufficient to justify them in a good-faith belief that the defendant had violated the law."

Here the officers had no evidence—apart from the mere word of an informer—that petitioner was committing a crime. The fact that petitioner walked fast and carried a tan zipper bag was not evidence of any crime. The officers knew nothing except what they had been told by the informer. If they went to a magistrate to get a warrant of arrest and relied solely on the report of the informer, it is not conceivable to me that one would be granted. See *Giordenello* v. *United States,* 357 U. S. 480, 486. For they could not present to the magistrate any of the facts which the informer may have had. They could swear only to the fact that the informer had made the accusation. They could swear to no evidence that lay in their own knowledge. They could

---

[9] *Maghan* v. *Jerome,* 67 App. D. C. 9, 88 F. 2d 1001; *Pritchett* v. *Sullivan,* 182 F. 480. See *Ravenscroft* v. *Casey,* 139 F. 2d 776.

present, on information and belief, no facts which the informer disclosed. No magistrate could issue a warrant on the mere word of an officer, without more.[10] See *Giordenello* v. *United States, supra*. We are not justified in lowering the standard when an arrest is made without a warrant and allowing the officers more leeway than we grant the magistrate.

With all deference I think we break with tradition when we sustain this arrest. We said in *United States* v. *Di Re, supra*, at 595, ". . . a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." In this case it was only after the arrest and search were made that there was a shred of evidence known to the officers that a crime was in the process of being committed.[11]

---

[10] See *State* v. *Gleason*, 32 Kan. 245, 4 P. 363; *State* v. *Smith*, 262 S. W. 65 (Mo. App.), arising under state constitutions having provisions comparable to our Fourth Amendment.

[11] The Supreme Court of South Carolina has said:
"Some things are to be more deplored than the unlawful transportation of whiskey; one is the loss of liberty. Common as the event may be, it is a serious thing to arrest a citizen, and it is a more serious thing to search his person; and he who accomplishes it, must do so in conformity to the laws of the land. There are two reasons for this: one to avoid bloodshed, and the other to preserve the liberty of the citizen. Obedience to law is the bond of society, and the officers set to enforce the law are not exempt from its mandates.

"In the instant case the possession of the liquor was the body of the offense; that fact was proven by a forcible and unlawful search of the defendant's person to secure the veritable key to the offense. It is fundamental that a citizen may not be arrested and have his person searched by force and without process in order to secure testimony against him. . . . It is better that the guilty shall escape, rather than another offense shall be committed in the proof of guilt." *Town of Blacksburg* v. *Beam*, 104 S. C. 146, 148, 88 S. E. 441.