73 N.J. Super. 477 (1962)
180 A.2d 206
STATE OF NEW JERSEY, PLAINTIFF,
v.
ROBERT LEE WATSON, ET AL., DEFENDANTS.
Superior Court of New Jersey, Essex County Court, Law Division.
Decided April 9, 1962.
*478 Mr. Maurice McKeown, Assistant Prosecutor, argued the cause for plaintiff (Mr. Brendan T. Byrne, County Prosecutor of Essex County, attorney).
Mr. Robert J. Jerome argued the cause for defendant.
MATTHEWS, J.C.C.
Defendant moves to suppress evidence obtained under an alleged illegal search of his person and subsequent seizures of lottery and bookmaking slips by members of the Newark Police Department. I find the facts surrounding the search and seizure to be as follows:
On March 2, 1961, or shortly prior thereto, Detective Cahill of the City of Newark Police Department was handed an anonymous note which had been addressed and delivered to Mr. Joseph F. Weldon, the Director of the Police Department of that city. The letter in its entirety reads as follows:
 "Mr. Weldon,
 My husband works at 212 Rome St. Steel Co
 thay play numbers and Horses at the end the week is broke.
 Colored man picks the slips 12-30-to 1:00 p.m.
 in the driveway, drive small truk 
 Of your man go all the way to the driveway
 the second door to the right."
On March 2 Detective Cahill and Detective Reilly of the Newark Police went to the vicinity of 212 Rome Street, Newark, and there assumed a position where they could observe all entries and exits to and from the building at that address. Sometime near 1 P.M. the detectives saw a colored man drive up to the front of No. 212 in a read and cream colored car. They observed this person (later identified as the defendant Watson) park the car, alight, and enter the building in question. After a wait of approximately five minutes they saw the same colored man leave the building and re-enter the red and cream car. At *479 this point the detectives approached the defendant who was sitting in the car. They asked him for his license and registration, and ordered him to get out of the car. He failed to produce a registration for the motor vehicle, and thereupon the detectives searched defendant's person and the motor vehicle which he had been using. The search of his person disclosed that he had in his possession several lottery slips and paper writings relating to bookmaking.
Under these facts, defendant contends that the search of his person and the subsequent seizure of the lottery and bookmaking material constituted an unlawful search contrary to the provisions of the Fourteenth Amendment to the Constitution of the United States.
The State in opposing this contention of defendant claims in effect that his argument is predicated upon the decision of the Supreme Court of the United States in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The State argues that since the decision in Mapp was handed down by the Supreme Court subsequent to the search and seizure here involved, that decision cannot apply in this case and should not be given retrospective application by me. This argument is completely devoid of merit. At the risk of oversimplification, it is clear that Mapp v. Ohio, supra, holds that the fruits of an unconstitutional search and seizure may not be admitted into evidence at a trial in a state court. Mapp overrules the prior decision of the Supreme Court in Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), to the extent that it held that the fruits of an unconstitutional search and seizure could be used in evidence in a state court trial. The decision in Mapp in no way altered the substantive law pertaining to the constitutional right of an individual to his privacy. As a practical matter defendants, prior to the decision in Mapp, did not move to suppress evidence obtained as the result of an unconstitutional search and seizure, since a judicial determination to the effect that a search and seizure was unconstitutional resulted only in *480 a Pyrrhic victory for the defendant concerned. See, e.g., Eleuteri v. Richman, 26 N.J. 506 (1958). Even if a search and seizure was held to be unconstitutional, nevertheless, the fruit of such unconstitutional activity would be used against defendant at his trial.
The net result of the decision in Mapp v. Ohio, supra, is to give logical meaning to a determination by a state court that an unconstitutional search and seizure has been perpetrated upon defendant. As I have noted heretofore, such a determination prior to the Mapp decision resulted in illogic and, perhaps at best, gave defendant the dubious right of a civil suit against the officers involved.
It must be conceded that Mr. Watson, defendant here, has not yet been tried under the indictments in question. Since his trial under these indictments is still pending, the question as to the admissibility of the fruits of the search herein alleged to be unconstitutional has not been passed upon. The law governing the admissibility of such evidence must certainly be the law which exists during the pendency of the action. Clearly, at this time the law established under the decision in the Mapp case is the law of the land. Under these conditions how can it be said that invocation by defendant at this time of the exclusionary doctrine established in the Mapp case constitutes a retrospective application of that case? It is my conclusion that defendant does not seek, in these proceedings, to have the court apply the exclusionary doctrine in a retrospective manner.
Returning to the facts in the present matter, the question posed is whether, under the circumstances presented, the officers had reasonable ground to believe that the defendant was in the act of committing a crime at the time that they stopped and searched him. Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). It is conceded that the officers did not have a warrant either for the arrest of, or to search defendant or his motor vehicle.
*481 The requirement that the officers have reasonable ground for belief of a defendant's guilt has been termed to be the substance of the definition of probable cause. Brinegar v. United States, supra. It is elementary that probable cause cannot be ascertained to have existed at the time of the arrest or search by viewing the fruits of the search, or the subsequent positive identification of the individual arrested as the culprit involved. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927). While the determination of the existence of probable cause, under circumstances such as are presented in this matter, must be determined judicially after the event, such determination must be made in light of the knowledge existing in the minds of the officers immediately prior to, or contemporaneously with, apprehension or search. In Brinegar Justice Rutledge, in referring to probable cause, stated (338 U.S., at p. 175, 69 S.Ct., at p. 1310):
"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved."
Brinegar involved the apprehension and search of a violator of the Liquor Enforcement Act of 1936 (49 Stat. 1928). The individual concerned was observed operating a motor vehicle under circumstances which indicated that he was coming from an area which was a known source of supply of alcoholic beverages, and proceeding to an area where the sale and dispensing of such beverages was prohibited. Brinegar had been, prior to the date of his arrest, engaged in illicit liquor operations. He had been under the surveillance of police authorities for a period of time prior to his apprehension. It was the opinion of the majority of the Supreme Court that under such circumstances it was *482 reasonable for the officers to believe that the individual was not going about legitimate affairs. The majority opinion in Brinegar, which upheld the arrest and search of the individual, posits the conclusion upon the quantum of knowledge in the possession of the intercepting officers at the time, together with the actions of the defendant in the operation of his motor vehicle shortly prior to his arrest. The holding in Brinegar is admittedly a close one and may well be explained because of the use of a motor vehicle by the defendant in carrying out the illegal activities in which he was engaged.
In Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), the Supreme Court was confronted with an issue involving the arrest and search of an individual by federal authorities without warrant. The arrest and search occurred in a railway terminal and was clearly based upon informer information. The question for decision in Draper was whether the knowledge of the related facts and circumstances gave the federal officer "probable cause" within the meaning of the Fourth Amendment, and "reasonable grounds" within the meaning of the Narcotic Control Act (70 Stat. 570, 26 U.S.C.A. § 7607), to believe that petitioner had committed or was committing a violation of the narcotic laws. 358 U.S., at p. 310, 79 S.Ct., at p. 329. The statement of facts set forth in the opinion in Draper disclosed that the federal narcotic agent involved had 29 years' experience; that one Hereford had been engaged as a "special employee" (informer) of the bureau of narcotics for about six months, and from time to time gave information to the narcotics officer regarding violations of the narcotics law; in turn the informer had been paid sums of money for his information. It was the experience of the officer that the information given by the informer had been accurate and reliable. On September 3, 1956 Hereford gave information to the narcotics officer to the effect that Draper had recently commenced to peddle narcotics in the officer's jurisdiction. On September 7 the *483 informer told the agent that Draper had gone to Chicago on September 6 by train for the purpose of procuring heroin and returning with it to the area; further, that Draper would return with the heroin to the area either on the morning of September 8 or 9  also by train. The informer supplied the agent with a detailed physical description of Draper and of the clothing he was wearing, and said that Draper would be carrying a "tan zipper bag" and habitually "walked real fast." Armed with this information the officer stationed himself at the railway terminal on September 8, but did not see anyone fitting the description given by the informer. On September 9 the officer again came to the terminal and during his vigil observed a person, having the exact physical attributes and wearing the precise clothing described by the informed, alight from an incoming Chicago train and start "walking fast" toward the exit. The individual was carrying a tan zipper bag in his right hand. The officers overtook the individual, later identified as Draper, and a search disclosed that he had in his possession bags of heroin and narcotic paraphernalia.
The majority of the Supreme Court concluded that under such circumstances the officer possessed probable cause within the meaning of the Fourth Amendment to stop and search Draper. The basis for the majority's conclusion appears in the following quotation of the opinion of Mr. Justice Whittaker (358 U.S., at pp. 312-313, 79 S.Ct., at p. 333):
"Nor can we agree with petitioner's second contention that Marsh's information was insufficient to show probable cause and reasonable grounds to believe that petitioner had violated or was violating the narcotic laws and to justify his arrest without a warrant. The information given to narcotic agent Marsh by `special employee' Hereford may have been hearsay to Marsh, but coming from one employed for that purpose and whose information had always been found accurate and reliable, it is clear that Marsh would have been derelict in his duties had he not pursued it. And when, in pursuing that information, he saw a man, having the exact physical attributes and wearing the precise clothing and carrying the tan zipper bag that Hereford had described, alight from one of the very trains from the very place stated by Hereford and start to walk at a `fast' pace toward the station exit, Marsh had personally verified every facet *484 of the information given him by Hereford except whether petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag. And surely, with every other bit of Hereford's information being thus personally verified, Marsh had `reasonable grounds' to believe that the remaining unverified bit of Hereford's information  that Draper would have the heroin with him  was likewise true." (Emphasis added)
In the matter presently before this court it is apparent that the officers here involved possessed only the information contained in the anonymous note when they repaired to the vicinity of 212 Rome Street on the day in question. It was impossible for the officers prior to their actual observations of defendant to have any reliable information concerning violation of the lottery law. The identities of both the alleged violator and the author of the note were unknown to the police authorities. Certainly, at this juncture, it cannot be said that the officers possessed reasonable grounds to believe that a violation of the lottery law was being committed by anyone at 212 Rome Street. As I see it, no warrant could have issued for arrest or search at that time. After stationing themselves in the vicinity of the Rome Street address, the officers observed a colored man parking an automobile, enter No. 212, and thereafter leave. What additional information did officers possess after observing defendant enter the Rome Street building and subsequently leave? Bearing in mind that the anonymous communication contained no other description of defendant save that he was a colored man, it seems to me that the police officers by their surveillance merely ascertained that an individual had gone into No. 212, remained a few minutes and left. While it is true that the time of this activity coincided approximately with the time set forth in the letter, this fact in itself could give no air of probability to a conclusion that the individual observed was pursuing illegal business. Contrast the activities observed by the officers (together with the information contained in the note) here, with that of officers concerned in the Brinegar and Draper cases.
*485 In Brinegar, the activities and known proclivity of defendant for illegal conduct was known to the officers for sometime. The observed activities on the day of his apprehension were such as could reasonably lead the officers to believe that he was engaged in similar illegal activity. At the time of his apprehension and search he was operating a motor vehicle on the public highways and thus could have easily eluded arrest should the officers have taken the time to obtain a search or arrest warrant.
In Draper, information of detailed nature was supplied to the officer by an informer who was known to have been reliable in the past. The detailed information thus obtained was verified personally by the officer at the railway terminal. The personal verification coincided so completely with the information theretofore obtained, that the conclusion of the officer that defendant was probably then violating the narcotics law, was practically inescapable.
Nothing in the knowledge of the officers here concerned immediately prior to the search and apprehension of defendant Watson even approximated the quality of the knowledge possessed by the officers in Brinegar and Draper, supra. The probability that the person observed by the officers entering and leaving the Rome Street address was about legitimate business appears at least equally as probable as the conclusion reached by them that he was then violating the law. Of course, as I have noted heretofore, the evaluation of the conclusion of the officers cannot be made in light of the determination made after the search that a crime in fact was then being committed.
It is my determination that the officers here could not and did not possess reasonable grounds to believe that defendant Watson was, at the time they stopped and searched him, violating criminal laws of the state. No probable cause existing at that time, the resulting search must be regarded as unreasonable and therefore unlawful.
Defendant's motion to suppress the evidence is granted.