**UNITED STATES of America,
Plaintiff,**

v.

**Marie A. BRYANT, Defendant.**

**Crim. No. 5–81062.**

United States District Court,
E. D. Michigan, S. D.

Nov. 17, 1975.

---

636

John L. Christensen, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Robert F. Mitchell, Jr., Detroit, Mich., for defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

PHILIP PRATT, District Judge.

The defendant herein was indicted on July 9, 1975 under 21 U.S.C. § 841(a)(1) for knowingly, intentionally and unlawfully possessing with intent to distribute heroin. The defendant now moves for the suppression of the evidence on which the indictment was based. She argues that there was no probable cause for her arrest and search of her baggage and that she did not consent to the search which led to the discovery of the controlled substance. Because of the factual issues raised, an evidentiary hearing was held on October 21, 1975. Two prosecution witnesses and the defendant testified.

Mr. Gary Bach, a Detroit police officer assigned to the narcotics section, testified that around mid-day on June 9, 1975 he received a long distance phone call from Kansas City. The speaker appeared to be a male but would not identify himself. He said that an "L. Bryant" would be arriving at Metropolitan Airport on a 3:45 P.M. flight from Kansas City and that she had narcotics on her person or in her effects. The caller said he had been in a motel room with her that day and had seen the narcotics there. The caller gave Bach a physical description of a young black woman in her twenties, of slight build, wearing a white jumpsuit, a blue sweater and a tan hat, as the L. Bryant to whom he referred. He then hung up.

Mr. Bach called the airport Drug Enforcement Administration office and asked for a check on the existence of such a flight. Officer Heath, of the Airport D.E.A. office, investigated and advised that there was an in-bound flight from Kansas City due to arrive at approximately that time and that the manifest indicated an "L. Bryant" as a passenger. Bach responded that he would drive to the airport immediately and meet Heath there. He testified that he did so, arriving at Metro around 2:30 P.M. and walked to the in-coming flight area near the arrival gate, meeting Heath along the way. He observed the defendant disembark from the Kansas City flight and come through the arrival gate dressed in clothes matching the description given by his informant. The defendant was met by a black male who accompanied her to the luggage area where she claimed some luggage. Mr. Bach was present when Officer Heath then detained the two, and asked them to accompany him to his office, where her luggage was searched.

Mr. Willy Heath, a member of the Detroit police department's narcotics squad, on assignment to the D.E.A., testified that he received Bach's call, provided the flight information and met Bach at the airport. At that time Bach described the phone call he had received, to Heath. They both observed the defendant debarking, as described above and watched the defendant and friend as they claimed the luggage. Officer Heath was waiting for them when they reached the top of the escalator to the main lobby area, and at that point he asked them to accompany him to his office on the mezzanine level.

After they were escorted to his office, Officer Heath informed the defendant that he had information that she possessed narcotics and asked permission to search her bags. Heath stated that she "complied" with this request. Heath opened her suitcase and found a white Ramada Inn envelope under an article of clothing. At that point she denied knowledge of the envelope or where it came from. Heath testified that she became unruly, that he then advised her of her constitutional rights and placed her under arrest.

Heath then opened the Ramada Inn envelope. Inside it he found another envelope which was sealed. Opening that envelope he found a "tar-like substance." Heath ran a standard field test and the results of the field test led him to believe it was a narcotic substance.

On cross-examination Heath stated that the detention and search was held in his "inner office," a room approxi-

mately 12 feet by 12 feet, furnished primarily with desks and office-type furniture. At the time of the search eight people were present—the two suspects and six police and D.E.A. officers. Heath repeated that he did not remember the defendant raising any protest when he asked to look through her bags.

The defendant, Marie Bryant, testified that she had traveled from her home town, Detroit, to Kansas City, to visit family relations. Another purpose of the trip was to see her ex-husband, who lived there. He paid the round-trip air fare for her and arranged the lodging for her at the Ramada Inn, where she stayed during her two-day visit. She testified that she carried only one suitcase and a hanging garment bag with her and that these remained in her motel room during the visit. She stated that before breakfast the day of her flight home she believed someone was "juggling with her door," trying to open it. The suitcase was unlocked and unattended in her room when she went to breakfast that morning.

The defendant testified that she and her brother, who met her at Metro, were stopped by Heath at the top of the escalator where he flashed a badge, took the baggage from her brother and led them to his mezzanine office. Arriving at his office he told her he wanted to search her luggage and purse. The defendant testified that she consented to a search of her purse, which he did. He then proceeded to search her luggage to which she objected. She said she wanted a female attendant to search it. However, he ignored this protest and opened the bag, at which time he found the envelope. She testified that she never touched the envelope after the agents found it and adamantly asserted that she did not give the officer permission to search the luggage.

## ISSUES

The two issues raised in this motion are (1) did the police officials have sufficient probable cause to conduct the warrantless search under these circumstances, and (2) did the defendant voluntarily consent to the search of her luggage. Only if the answer to both questions is negative should the Court suppress the evidence.

## DISCUSSION

### I.

The government relies on *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) and *United States v. Hamilton*, 490 F.2d 598 (9th Cir. 1974) for the proposition that information itself can be so detailed as to be inherently reliable. The Court in *Hamilton* suggested this as a permissible indicia of reliability and referred to *Draper, supra*. However, in both *Draper* and *Hamilton* the informant had, from past experience, proved to be reliable to the satisfaction of the police. Furthermore, in each of these cases the informer's identity was known to the authorities.

Here, however, Officer Bach received a tip from an unidentified source who did not disclose his name or have any record of reliability. Cases such as *Draper* and *Hamilton* are clearly distinguishable.

The government, however, would rely on the fact that the unknown informant's information was corroborated by their observations at the airport. It is true that federal courts have, on occasion, found probable cause to exist based solely on a tip from an unnamed informant of unknown reliability, where the tip was corroborated later by other information. *See Newcomb v. U. S.*, 327 F.2d 649 (9th Cir. 1964). However, in every instance examined, the later information which corroborated the tip was substantial and was of a nature which might reasonably lead to the conclusion that an illegal activity was ongoing. *See Newcomb v. U. S., supra.*

In this case, the only information relayed by the informant which could be corroborated by the police *prior* to arrest and search was the physical description of the defendant. That information was corroborated but by itself it does not

show sufficient probable cause that the defendant had or was about to engage in criminal activity. And of course, corroboration after the arrest, "provided by the fruits of the search cannot be used retroactively to justify the arrest." *Costello v. U. S.*, 324 F.2d 260 (9th Cir. 1963), cert. denied, 376 U.S. 930, 84 S.Ct. 699, 11 L.Ed.2d 650.

This Court, therefore, is of the opinion that there was insufficient indication of reliability of this informant and that there was no corroboration of any significant facts to create a reasonable belief of criminal activity or past criminal involvement or relationships. No reasonable ground for arrest and search exists where the arresting officer is without knowledge of commission of a crime except from an informer whose reliability is unknown. *Wong Sun v. U. S.*, 288 F.2d 366 (9th Cir. 1966), reversed 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

To hold otherwise would result in a completely unacceptable and dangerous precedent. Any unverified and unverifiable tip would result in any passenger being detained and searched merely on a phone call giving a time, a flight and description accompanied by an accusation of criminal activity. Such an invasion of constitutional rights can not be tolerated. There not having been a valid arrest, the government cannot rely on the theory of a search incident thereto as justification for the search.

## II.

■■■ The government also contends that the defendant consented to the search of her luggage. While this factual issue was disputed by the defendant at the evidentiary hearing, for purposes of this motion the Court will initially assume that the agent's testimony was accurate and will consider whether, under the factual circumstances described above, such a consent was voluntary.

The Supreme Court's decision in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1972) provides guidance in such a determination. Initially it is generally agreed that the prosecutor has the burden of proving that the consent to search was freely and voluntarily given. 412 U.S. at 222, 93 S.Ct. at 2045. What he must prove is a more difficult question. The Supreme Court in *Schneckloth, supra*, agreed with the California courts:

"That the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of the totality of all the circumstances."

Some of the factors to be considered are (1) did the defendant know he had the right to refuse consent, (2) was the defendant affected by "subtly coercive police questions," (3) how vulnerable was the defendant to the method used in obtaining consent, (4) whether the defendant is considered to be "in custody," (5) the environment in which the defendant gave consent.

The Supreme Court in *Schneckloth* by its own language limited its holding to non-custody situations. However, a number of federal courts have applied the doctrine to in-custody cases. In *U. S. v. Luton*, 486 F.2d 1021 (5th Cir. 1973), the court stated that:

"In this circuit valid consent to search may be given by a person under arrest who has not been specifically informed of his Fourth Amendment rights, so long as there is no proof of coercion or intimidation and if prior to the search *Miranda warnings are given.*"

The Ninth Circuit in *U. S. v. Heimforth*, 493 F.2d 970 (9th Cir. 1974) also held that the *Schneckloth* standard would be applied to both custody and non-custody situations and that custody was merely a factor to be considered. *Heimforth* is distinguished from *Luton, supra*, however, in that the Ninth Circuit holds that whether a prior *Miranda* warning is given will only be a factor of consideration; it is not a prerequisite.

It is clear that a custodial situation existed in this case. The defendant, prior to the search was not told that she was in custody, yet she was led to a small room where she was surrounded by six police officers. Furthermore, Agent

Heath testified that if she had tried to leave he would have "detained her."

Although, by necessity, any consent question must be decided after a "careful sifting of the unique facts and circumstances of each case," comparison of existing coercive and non-coercive factors in other cases can be useful. In this regard, this Court notes the decision of the Sixth Circuit in *U. S. v. Hearn*, 496 F.2d 236 (6th Cir. 1974). The District Court found that the defendant had consented to the questioned search. The Court of Appeals noted the following factors tending to establish an uncoerced consent:

> "(a) his having been initially given his *Miranda* advice of rights incident to his arrest on the stolen welder charge;
>
> (b) his continued freedom of movement and the lack of any physical restraint incident to his arrest upon the stolen welder charge;
>
> (c) his presence on his own farm and in familiar surroundings;
>
> (d) his acquiescence in the officer's suggestion to 'go look at it' . . . and his affirmative response, 'Well, let's go see it'; and
>
> (e) his leading the way to the barn . . ."

Other factors tending to establish an involuntary and coercive consent search included:

> "(a) the presence of three law enforcement officers on his farm;
>
> (b) his initial arrest upon the stolen welder charge;
>
> (c) the suggestion by the officers that the barn be inspected for the presence of the traxcavator;
>
> (d) the use by the officers of information gained by a prior unlawful search . . . ; and
>
> (e) the absence of any warning to the appellant that he had a constitutional right to refuse to consent to a search of the barn."

Evaluating these factors and the totality of the circumstances, the Court of Appeals concluded that the coercive factors *outweighed* the non-coercive ones and held the district court's conclusion to the contrary to be "clearly erroneous." 496 F.2d at 244.

In the present case *none* of the non-coercive factors noted in *Hearn* were present. The defendant was not given her *Miranda* rights prior to the initial search. If not formally in custody, she was nevertheless effectively restricted to the small office area of the D.E.A. officer—certainly not her normal and "familiar surroundings." She displayed no clear affirmative response to the request to search as was given in *Hearn* where the defendant voluntarily led the officers to the barn.

Moreover, most of the coercive factors present in *Hearn* are also present here. The defendant and her brother were surrounded by six police officers (or D.E.A. agents). The circumstances indicate that the defendant was under a "practical" arrest, if not formal arrest. The officers had physical control over the luggage which they "asked" to search. Finally, there is no indication from the record of the evidentiary hearing that the officers told the defendant that she had a constitutional right to refuse to consent.[1]

Considering these facts, the Court does not need to make a judgment whether the defendant actually gave verbal consent to the search. For, assuming that the agent's testimony is correct and she verbally consented, nevertheless the coercive factors present in this situation are equal to or greater than those found in *Hearn, supra,* and clearly outweigh any voluntary or non-coercive factors. Therefore, this Court concludes that, applying the standards of *Schneckloth, supra,* the consent given was not voluntary, but rather, was coerced and may not be used by the government to escape the standard requirement of a warrant for such a search.

---

1. This is not to say that in every instance such advice must be given before a consent is valid. It is but a factor to be considered in the "total-ity of circumstances" test. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 229–230, 93 S.Ct. 2041.

For these reasons the Court holds that the search of the defendant's luggage was constitutionally infirm and the evidence procured from the search must be suppressed. The defendant's motion is granted.

It is so ordered.