390 So.2d 1136 (1980)
Ricky Joe WHITENER
v.
STATE.
8 Div. 348.
Court of Criminal Appeals of Alabama.
August 19, 1980.
Rehearing Denied October 7, 1980.
*1137 Steven E. Haddock, Decatur, for appellant.
Charles A. Graddick, Atty. Gen., and Elizabeth Ann Evans, Asst. Atty. Gen., for appellee.
LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from a conviction under Chapter 4, Title 28, Code of Alabama 1975. The offense is proscribed and the punishment prescribed by § 28-4-115:
"It shall be unlawful for any person, firm or corporation or association within this state to transport in quantities of five gallons or more any of the liquors or beverages, the sale, possession or transportation of which is prohibited by law in Alabama. Any person convicted of violating this section shall be guilty of a felony and, upon conviction, shall be imprisoned in the penitentiary of this state for a period of not less than one year, nor more than five years."
Upon the return by the jury of the verdict of guilty, the court sentenced defendant to imprisonment for three years.
According to the undisputed evidence, an officer found thirty cases of beer in the trunk of an automobile driven by appellant just after the automobile had passed over the bridge over the Tennessee River, going south on Highway 31 in Decatur, Morgan County, Alabama, at approximately 1:15 P.M. May 12, 1979. Before such evidence was introduced, the court conducted a hearing out of the presence of the jury on a pretrial motion of defendant to suppress evidence as to what was found. The court's denial of the motion, together with its overruling defendant's objection to the evidence when presented, constitutes the major insistence of appellant for a reversal. Appellant argues there was a violation of defendant's constitutional right to security against an unreasonable search and seizure.
There is a conflict in several particulars between the testimony of the officer who found the beer and the testimony of defendant and one riding with him in the automobile, which the trial court obviously *1138 resolved against defendant, which was well within the province of the court to do; and we treat the issue presented as if the version of the officer as to what occurred in connection with his discovery of the beer and his apprehension of defendant is correct.
No warrant for the search of the automobile of the defendant had been obtained. The officer, Sergeant James Steenson, of the Decatur Police Department, received a telephone call from a confidential informant about 9:00 P.M. on Friday, May 11, 1979. Sergeant Steenson testified:
"The substance of the information that evening was that he [defendant] would be coming through Decatur possibly two or three trips that [the following] morning hauling beer, and that he would be in a dark-colored Chevrolet, which would be a '65 to '67 model.
"Q. And do you have any information as to what route he would be taking?
"A. Yes. That he would be coming in there across the bridge."
Officer Steenson further testified that on May 12 he watched for defendant and the automobile about 11:20 A.M., but that he did not maintain a constant watch by reason of other duties to perform, and that about 1:15 P.M. May 12 he saw the automobile driven by defendant with another person therein. The officer followed the automobile for a short distance, signalled it to stop, and thereafter the beer was found in the trunk.
Numerous cases are cited by both parties that pivot upon the question whether the warrantless search of an automobile is justified. We see no necessity for discussing all of them, however, by reason of concurrence of the parties in the view that, under the circumstances here presented, the search of the automobile and the seizure of the beer would have been unconstitutional, unless the officer had probable cause for believing that defendant was unlawfully transporting beer at the time or that defendant voluntarily gave his consent for the officer to make the search. Furthermore, the parties have lessened the need for extended discussion of cases involving the existence of probable cause vel non by recognizing that adequate guidance is found in Hatton v. State, Ala.Cr.App., 359 So.2d 822, writ quashed, Ala., 359 So.2d 832 (1977):
"The legality of the warrantless stop and search of the appellant's automobile turns on whether the Sheriff and his deputies had probable cause to believe that it contained contraband. [Authorities cited] ...
"Probable cause may be based solely upon information obtained from a reliable informant hearsay information. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Clenney v. State, 281 Ala. 9, 198 So.2d 293 (1966). A tip may supply the basis for probable cause in and of itself where it discloses (1) some of the underlying circumstances which justify a conclusion that the informer is credible or his information is reliable, and (2) some of the underlying circumstances tending to demonstrate that, in the specific instance in question, he has drawn his conclusion of criminality in a reliable manner. Aguilar, supra. These two tests are of the dual `prongs' of Aguilar the veracity prong and the basis of knowledge prong. They constitute the initial standard to be applied in assessing the probative value of an informant's information. If the tip fails one of these prongs, the informant's report may still constitute the sole basis for a finding of probable cause if the information provided is in such detail and minute particularity that a `magistrate, when confronted with such detail could reasonably infer that the informant had gained his information in a reliable way.' This is the self-verifying tip. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Less detailed information from a reliable source may also be used as grounds for a finding of probable cause where the key elements of the tip are verified or corroborated. Ex Parte State ex rel. Attorney General v. State, 286 Ala. 117, 237 So.2d 640 (1970); Payton v. State, 47 Ala.App. 347, 254 *1139 So.2d 351 (1971). Finally a tip that will not meet any of these statements may still be used in conjunction with a number of other factors of `further support' to show probable cause."
We examine the facts pertaining to the question of probable cause in the light of Hatton as quoted above and the principles stated therein. As to the stated prong (1) of Aguilar, we need only say that it is clear that the circumstances of the instant case justified a conclusion that the informer was credible with a good record of reliability for correctness, and there is no contention to the contrary. The specific issue between the parties is whether the requirements of prong (2) are met, and, if not, whether the "tip" causing the search is intrinsically verified or was extrinsically corroborated or supported, in the light of Spinelli, supra, and subsequent cases.
In Hatton, supra, it was held that there was probable cause that justified the warrantless search of appellant's automobile, but in so holding it was stated: "We recognize that the probable cause present in this case represents the bare minimum necessary for a valid search without a warrant." 359 So.2d at 822. We compare the circumstances in the case under review with those stated in Hatton. We have herein stated all that the transcript shows that informer told Sgt. Steenson. Pertinent to the question of probable cause, there is also to be considered what the transcript shows as to the personal knowledge of Sgt. Steenson and what he had heard about the appellant, as to which there is no dispute. He stated that defendant had a reputation as "a transporter" and that his "reputation in general" was "not good." Upon being questioned as to any other information received from the informer, he said the informer had not told him that he had been in the presence of defendant the night the information (the tip) was given him, that the informer did not tell him that the informer had seen defendant driving the particular automobile the night the information was given. Sgt. Steenson testified further as follows:
"Q. Did he tell you that he saw this particular automobile loaded with thirty cases of beer?
"A. That particular thirty cases of beer?
"Q. Any thirty cases of beer that night.
"A. No.
"Q. What was the basis for his knowledge except Ricky Whitener's general reputation?
"A. The basis for his knowledge is that he is more or less in the know.
"Q. He is just in the know?
"A. Yes.
"Q. And was just in the know on this particular night?
"A. That particular night, yes.
. . . . .
"Q. At the time the call was placed to you at 9:00 the night of May 11, did you make any effort at the time to verify the information or corroborate the information that had been given to you by the informant?
"A. I didn't verify it at the time because I didn't know where to go to verify it at the time.
"Q. He did not tell you where the informant-the accused was at the time?
"A. No, he did not.
"Q. Did you hear any from your informant again after that night at 9:00 with regard to this particular instance?
"A. Before the arrest?
"Q. Yes, sir.
"A. No, I did not."
In Hatton, supra, the informant had gone to the home of the County Sheriff, who knew both the informer and the appellant, and had stated to the Sheriff that appellant was purchasing pills at a particular drug store "on a lot of Friday afternoons," that appellant "didn't purchase drugs every Friday, but some Fridays," that he purchased a large quantity on each occasion and "got them for truckers ... and carried them back to his (service) station." Upon being asked by the Sheriff to give him additional information concerning future drug activities, the informant contacted the Sheriff's secretary on a Friday about 12:00 Noon and *1140 asked that she relay to the Sheriff what the informant and the Sheriff had talked about the night before "was going to take place at 4:00 (P.M.) and that he would be driving a Lincoln." A "stake out" was arranged and about 6:00 P.M. appellant arrived in a Lincoln automobile, went into the drug store, returned from it with a white paper sack in his hand, got into the automobile and left. The automobile was soon stopped by the officers, who searched the automobile and found eight hundred capsules of phentermine.
The total of the information received by the officer from the informer, the information the officer had otherwise obtained as to defendant's reputation and as to his being a transporter, and the knowledge the officer acquired in observing the defendant driving his automobile and immediately thereafter was much less than the total of the information that had been received directly or indirectly from the informer by the arresting and searching officers in Hatton and the knowledge they acquired from their observance of the activity of defendant just before a search of his automobile and his arrest. In that case, the informer, according to what the officers had learned directly or indirectly from him, had stated that as a fact defendant "was purchasing pills," that he "purchased a large quantity on each occasion," that he got them for truckers and carried them back to his service station. The officers making the search actually saw the defendant go into the drug store on his scheduled day of the week and return therefrom with a white paper sack in which the controlled substances were found.
In the instant case, the informer's statement contained no recital of any past or then existing criminal activity of the defendant. It was all in futuro, with no background of any past or existing fact to support the purported prophetic utterance. The informer's information that defendant had bought controlled substances from the specific drug store on previous Fridays was to some extent, at least, corroborated by the observance by the officers of defendant's entry into the drug store and returning therefrom with a paper sack in his hand to an automobile that answered the description contained in the information of the informer. Even if what the informer had told Sgt. Steenson had been a statement of a fact, as distinguished from a mere prediction, there was nothing that came to the attention of Sgt. Steenson that tended in the least to corroborate or verify any notion that Sgt. Steenson may have obtained from the informer that defendant was illegally transporting beer.
We have heretofore considered all that was told Sgt. Steenson by the informer. We now give special consideration to the testimony of Sgt. Steenson that the basis for the informer's knowledge of what would take place at the bridge the next evening was that the informer was "more or less in the know," that he was "just in the know" on "that particular night."
"Q. When this informant called you on the night of May 11, did he tell you he had been in the presence of Ricky Whitener that night?
"A. No, he did not.
"Q. Did he tell you he had seen Ricky Whitener driving this particular automobile on that night?
"A. Not that night, no.
"Q. Did he tell you that he saw this particular automobile loaded with 30 cases of beer?
"A. That particular 30 cases of beer?
"Q. Any 30 cases of beer that night?
"A. No.
"Q. What was the basis for his knowledge except Ricky Whitener's general reputation?
"A. The basis for his knowledge is that he is more or less in the know.
"Q. He is just in the know?
"A. Yes.
"Q. And was just in the know on this particular night?
"A. That particular night, yes."
We accept the meaning of the expression "in the know" as found in the definition of the noun "know" in Webster's New International Dictionary (3d ed.):

*1141 "The fact of knowing; knowledge; intelligence;-chiefly in the colloquial phrase in the know, having special, somewhat exclusive, knowledge or information."
Perhaps the particular characterization by Sgt. Steenson of the informer has some value on any question as to his credibility or reliability that is necessary to meet the first prong of the Aguilar test. It has little, if any, value as to the "basis of knowledge prong." Perhaps it would, if it were related to any past or then existing fact, if it were shown to have been based upon what the informer had learned by one of his five senses. It was sheer prediction. If the informer had told Sgt. Steenson what the informer had seen or heard, Sgt. Steenson would have had the right to rely and act upon it. He had no right to rely solely upon what the informer or anyone else told him would occur the next day. That defendant appeared the next day at the place stated by the informer and in the kind of automobile described by the informer, is in no sense corroborative of the statement that he would be illegally transporting beer.
There may be an additional reason for questioning the legality of the search that is to be found in the fact that the crime charged is a crime only in limited areas of Alabama. Although Morgan County is a dry county, Madison County, adjoining it nearby on the northeast, is a wet county. If it is assumed that the informer had factual information to the effect that defendant was transporting any cases of beer in Madison County, this in and of itself would not have furnished sufficient basis for probable cause for believing that he would transport it into Morgan County.
There was testimony by Sgt. Steenson that in following the automobile he noticed it was "bouncing some ... more than what an automobile should bounce ... a different type of bounce." Appellee does not expressly contend, there was no testimony to indicate, and we do not believe, that this was a substantial factor in causing the automobile to stop and be searched.
Under all the circumstances, we must conclude that at the time the search was made, the officer did not have probable cause for believing that there were five gallons of beer or more in the trunk of the automobile.
Similar in many respects to the circumstances that led to the search of an automobile is Rickman v. State, Ala.Cr.App., 361 So.2d 22, rev'd, Ala., 361 So.2d 28. The difference between the Supreme Court and the Court of Criminal Appeals was as to the question of "exigent circumstances." The Court of Criminal Appeals had held there was probable cause for believing that the automobile contained contraband but that "exigent circumstances did not exist so as to justify a failure to procure a search warrant." The Supreme Court held that "exigent circumstances" did exist. The informer therein notified the authorities that defendant had told the informer that he would arrive at the informer's home at a stated time "and that he would be bringing cocaine with him." In marked contrast, there is nothing in the instant case to show or even indicate that defendant had told the informer that he would be transporting thirty cases (five gallons) of beer into a dry county.
Appellee urges that defendant consented to the search. It appears that the learned trial judge based his action, in overruling the motion to suppress, chiefly, if not entirely, on the conclusion that defendant did give his consent to the search. The parties made an issue not only of law, but also of fact, as to what transpired between Sgt. Steenson and defendant. Their testimony was in irreconcilable conflict. We have no reason to doubt the trial court's correct acceptance of the testimony of Sgt. Steenson. As previously indicated, our determination of the question whether defendant voluntarily consented to the search is based exclusively upon the testimony of Sgt. Steenson's version of what occurred, which essentially is as follows:
"A. Before he got out of the car I advised him that I had information that he was transporting beer, and that I needed to look in the trunk of his automobile. I told him at that time that if he did not *1142 want to let me look, then I would go up the street and get a search warrant; that I intended to look in his vehicle.
"Q. What was his response to that?
"A. That's when he got out of the car.
"Q. And then what next occurred when he got out?
"A. We walked back to the back of the car and he told me, he said, `Sgt. Steenson, I don't know what is in the trunk of that car.'
"Q. What next occurred?
"A. We had some more discussion, and I told him again that I needed to look in the trunk of his car, and that if he did not want me to, I would get a warrant. At that time he walked back up to the front of the car and he had a discussion with his friend. When the discussion with his friend was over, he pulled the keys out of the ignition, he came back and unlocked the trunk.
"....
"A. He took the key out of the ignition, brought it back to the back of the vehicle, and at that time told me, he says, `There are 30 cases of beer in the trunk,' and he opened the trunk.
"Q. Before you opened it he told you there were 30 cases of beer in the trunk?
"A. And then opened the trunk.
"Q. All right. I believe you testified that you told him you could look in it with his permission, or you could go get a warrant.
"A. Yes, I did.
"Q. Is that what you intended to do?
"A. I did."
The parties are in agreement that the search of the trunk by Officer Steenson was constitutionally permissible if the defendant consented to the search. Lofton v. State, Ala.Cr.App., 371 So.2d 988, 991 (1979); Woods v. State, 57 Ala.App. 1, 325 So.2d 517; Armstrong v. State, 49 Ala.App. 396, 272 So.2d 603. There can hardly be any disagreement with the proposition that to constitute a valid consent it must be freely and voluntarily given, and that the burden of proof is upon the prosecution to prove the essential free and voluntary nature of the consent. Barclay v. State, Ala. Cr.App., 368 So.2d 579, writ denied, Ex parte Barclay, 368 So.2d 581 (1979).
There have been innumerable cases in which appellate courts have been called upon to decide whether a purported consent to search was freely and voluntarily given, so many that it is clearly advisable to limit consideration and reference to those in which, as here, the purported consent was obtained after the officer expressed to the accused some reference to an alternative of procuring a search warrant. There is such a multitude of such cases that it is hardly appropriate to discuss all of them.
There can be no variance from Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797, 802-803 (1968) in which it is stated:
"The issue thus presented is whether a search can be justified as lawful on the basis of consent when that `consent' has been given only after the official conducting the search has asserted that he possesses a warrant. We hold that there can be no consent under such circumstances.
"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all. 15
"When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion albeit colorably lawful coercion. Where there is coercion there cannot be consent."
*1143 We have not included in the quoted excerpt from Bumper v. North Carolina, footnote indicators except as to note 15, which we deem of such tremendous significance as to the point now under consideration that we now quote it:
"15. During the course of the argument in this case we were advised that the searching officers did, in fact, have a warrant. But no warrant was ever returned, and there is no way of knowing the conditions under which it was issued, or determining whether it was based upon probable cause."
We take it that Mr. Justice Stewart, speaking for the Court in Bumper, opined that a turning point on the validity of the search was not exclusively whether the representation that the officers had a warrant was correct, but also whether any warrant that had been obtained "was based upon probable cause." It necessarily follows therefrom that when an officer procures the purported consent of an accused to search his person or effects solely by reason of a representation to him that he has a search warrant, consent is not voluntarily and freely given if the warrant is deficient in its not being based on probable cause. It follows also, we think, that when an officer obtains the consent of an accused to a search of his person or property solely by reason of his representation to him that he will obtain a search warrant, such consent is not voluntarily and freely given unless a warrant can be issued based upon probable cause. As we have already held, there was no probable cause for believing that defendant was unlawfully transporting beer at the time of the search.
Readily distinguishable are many cases in which a consent to search was voluntarily and freely given under circumstances where probable cause did not exist. It is often desirable by the consenter that the search be conducted. Particularly is this true when he knows or has good reason to believe that the search will not disclose anything to incriminate him or anyone else in whom he has an interest. No such situation existed here. According to the undisputed evidence, defendant knew he was driving an automobile in which more than five gallons of beer was being transported, that it was in the trunk of the automobile and would be found by Sgt. Steenson when defendant opened the trunk. The only reason he opened the trunk was the officer's statement that otherwise he "would" obtain a warrant. Based on all the information had at the time, he could not have obtained a valid search warrant. If he had obtained a search warrant under such circumstances and thereby searched the trunk of the automobile and found the beer, the search would have been violative of the Fourth Amendment to the Constitution of the United States in that it would not have been issued "upon probable cause." For no less reason, the search was unconstitutional in the absence of a warrant.
We note that in the abundance of cases wrestling with the problem whether a consent to search that is obtained by a searching officer's representation as to the alternative of obtaining a search warrant, it is indicated, and sometimes asserted, that there is a conflict among the authorities on the subject. Of course, there may be, but whatever difference there may have been in determining whether the purported consent was voluntarily and freely given, it does not necessarily denote a conflict of view as to the principle that we find implicit in Bumper, supra, that is, that where the purported consent to search is obtained by the searching officer's unreliable assurance that a valid search warrant has been or can be obtained, the consent is not voluntarily and freely given.
In United States v. Culp, 472 F.2d 459 (8 Cir. 1973), the court upheld as voluntarily and freely given the consent to a search when one of the officers made a statement very similar to that made by Sgt. Steenson in the instant case. The officer stated that "We are in the process of getting one [a search warrant]; one of our men is getting one, and we'll search it [the premises] whether you like it or not." The court held that regardless of what had been told him by the officer as to a search warrant there was an "independent basis" for the consent, *1144 which was "to have the police and court go easy on his wife." There was no "independent" basis for the purported consent in the case now before us. Of special interest in connection with the pending problem is the content of footnote 1 in United States v. Culp at 472 F.2d 461:
"Many cases imply that where law enforcement officers indicate only that they will attempt to obtain or are getting a warrant that such a statement cannot serve to vitiate an otherwise consensual search. [omitted are numerous citations]."
The court indicated that most of the cited cases supported the statement in the footnote but that some of the cited cases were to the contrary. We now consider separately the first three cases cited in said footnote in support of the principle stated therein: United States v. Savage, 459 F.2d 60, 61 (5 Cir. 1972); United States v. Curiale, 414 F.2d 744, 747 (2 Cir. 1969), cert. denied, 396 U.S. 959, 90 S.Ct. 433, 24 L.Ed.2d 423; United States v. Boukater, 409 F.2d 537 (5 Cir. 1969). In United States v. Savage, the accused had asked the officer if he could get a search warrant, and the officer replied, "Yes, we probably can." The court said, "The officer's statement was in response to defendant's inquiry, and it was not a misrepresentation of the facts." That it was not a misrepresentation of the facts indicates at least that there was probable cause. In United States v. Curiale, the accused said, "If I don't sign this [a written consent], you are going to get a search warrant." The officer replied, "I don't want you to sign on that basis. If you are going to sign it, do it voluntarily." Curiale then signed the written consent. In United States v. Boukater, the officer's statement was that "he would attempt to get a search warrant."
To be consistent with Herriott v. State, Ala.Cr.App., 337 So.2d 165, cert. denied, Ala., 337 So.2d 171 (1976), we must hold that the consent of appellant herein was not voluntarily and freely given. In Herriott, it was held, as it has been determined in this case, that no probable cause existed. What the officer said to the accused in that case relative to the alternative of procuring a search warrant was substantially the same as what the officer told the appellant herein, except that in Herriott it was supplemented by what the magistrate had told the officer and was much more in detail. Some of it was as follows:
"A. Yes, I told him I already talked with a warrant magistrate and I could get a search warrant.
"Q. After you advised him of that, what took place?
"A. I read this form to him and I gave it to him to read himself, and he agreed to fill in the blanks and sign the form.
"....
"A. I told him I had contacted the Warrant Magistrate and he told me I could get a search warrant.
"Q. Didn't you tell him you would go get a search warrant and you were going to leave these two police officers there to stay until you got back?
"A. I told them I could go get a search warrant and they would stay outside until I got back.
"....
"Q. But you told them, and I am not arguing with you, but you told him you could get the warrant, is that correct?
"A. Right.
"Q. You didn't tell them that you believed one may be issued, did you?
"A. No, sir, not that I recall.
"Q. And you didn't tell them that the decision rested with the Judge or Magistrate, did you?
"A. Not that I recall.
"Q. And you gave them two choices. (1) the search or (2) you would get the warrant, isn't that correct?
"A. I guess that's about the way it was."
Placing the same emphasis upon the absence of probable cause as was placed upon its absence in Herriott, we reach the same conclusion reached therein, "that the State here failed to establish the necessary voluntariness of the alleged consent." 337 So.2d at 169.
*1145 When considering whether one's consent to a search has been influenced by a statement that a search warrant has been or will be obtained, it must be subsumed that the reference is to a valid search warrant, one based upon probable cause. There would be no triumph of logic to hold that a consent is voluntary when procured by an incorrect statement that such a warrant can be obtained but that the consent is involuntary when procured by an incorrect statement that such a warrant has been obtained, which, according to quoted footnote 15 in Bumper v. North Carolina, supra, is the effect of what was held in that case.
The judgment of the trial court should be reversed and the cause remanded for the error indicated. As grounds of other assertions of error will not likely occur again, we forego consideration of them at this time.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
HARRIS, P. J., and BOOKOUT and BOWEN, JJ., concur.
TYSON, J., concurs specially.
DeCARLO, J., dissents.
TYSON, Judge, concurring:
I concur in the foregoing opinion as prepared by Judge Clark for this court.
As noted in Herriott v. State, Ala.Cr. App., 337 So.2d 165, cert. denied, Ala., 337 So.2d 171 (1976) and Gass v. State, Ala.Cr. App., 372 So.2d 904 (1979), the alleged consent of the party under detention must be voluntary under all the attendant circumstances. I am of the opinion that the alleged consent in the instant case, as in Herriott and Gass, supra, was mere submission to lawful authority and was not therefore voluntary.
DeCARLO, Judge, dissenting.
In Draper v. U. S., 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327, we learned that probable cause may be proved upon a showing that facts, given to the investigating officer through an informant's tip, can be verified at the time the illicit scenario unfolds.
In my judgment, the facts in the present case show sufficient verification to support probable cause. Clenney v. State, 281 Ala. 9, 198 So.2d 293.
For this reason, I respectfully dissent.