McMillan, judge.
The appellant was convicted of violating the Alabama Uniform Controlled Substances Act, specifically for possessing Dilaudid. He was sentenced to 15 years’ imprisonment and was fined $100,000. Although the appellant has raised three issues on appeal, because one of them requires a reversal, the remaining two issues will not be discussed.
Investigator William F. Batson, of the Alabama Bureau of Investigation Narcotics Division, testified that he received information that the appellant had been involved in fraudulent prescriptions, in that he was either writing the prescriptions or having them written. Investigator Batson testified that he had information that the prescriptions were being given to older people, generally “winos” who were cleaned up and instructed to take the prescriptions into drug stores and have them filled. The prescriptions bore the name of Dr. Jacob Dagani. Investigator Batson testified that he approached the appellant by telephone and informed him of “what I [Batson] knew” and asked for his assistance. Investigator Batson stated that he told the appellant that “if Billy agreed to assist us in this investigation that the particular evidence that he turned over to me there at the apartment would not be used against him when we prosecuted him on the charges, and that this information, that he assisted us, would be brought to the D.A.’s attention, the fact that he did assist us.” The record indicates that the appellant’s attorney at that time was aware of these promises; however the record does not disclose whether the attorney advised the appellant or informed him of his knowledge of the promises.
After Investigator Batson telephoned the appellant, he consented to allow Investigator Batson to enter his apartment, wherein the appellant described, according to Investigator Batson, “the whole scheme or the whole way that they were doing it, the whole idea, the way they started from line one to the end of it.” Investigator Batson testified that he could not recall whether he had informed the appellant of his Miranda rights. Investigator Batson testified that the appellant, a woman named Joyce Lynch, and he were the only individuals present. The appellant was using prescription blanks of Dr. Dagani, whose receptionist was verifying the fake prescriptions as they were called in. The appellant also gave Investigator Batson an entire package of prescriptions made out to various names. One of the names was “Elizabeth *1128 Peoples.” He also showed Investigator Batson a list of names, including “Elizabeth Peoples,” which he planned to use in the prescription blanks. Investigator Bat-son further testified that the appellant agreed to work for him to “set up the ring” that was forging prescriptions on Dr. Da-gani, and further,
“[t]hat he would continue doing what he had been doing in the past as far as making up the prescriptions, going down to the Jimmy Hale Mission and picking up a wino, taking him and cleaning him up and buying him a new pair of pants, a shirt, getting him shaved and making him look presentable, giving him the forged prescription written on Dr. Daga-ni, taking it to a drug store at a time at which Dr. Dagani was not in his office _ The wino would bring the — the old man would bring the drugs out to Billy Luttrell, the defendant. Billy Lutt-rell would either pay the wino with money, wine, in some cases give him a pill from the prescription. After he took the wino back to Jimmy Hale Mission he would then return and meet Mike Lynch, Joyce Lynch’s husband, and would dispense or distribute the drugs between the two of them.”
Investigator Batson testified that this arrangement was made while he was at the appellant’s apartment.
Several weeks later, Investigator Batson, while assisted by an employee of the district attorney’s office, and William B. Carson, of the Jefferson County sheriff’s office, “staked out” a drug store where, on the previous day, he had observed a prescription for Dilaudid made out to “Elizabeth Peoples” and signed by Dr. Dagani. The appellant arrived at the drug store, accompanied by Verley James Rogers. Rogers entered the drug store while the appellant parked at the end of the parking lot. A prearranged signal had been made which the pharmacist was to use in order to call Investigator Batson’s beeper. Investigator Batson then entered the drug store. He observed Rogers walk back to the car, carrying a white paper bag. The officers began to follow the appellant’s vehicle. Investigator Batson testified that he observed the appellant holding a white paper bag in his hand and apparently looking into the bag. The officers then pulled the appellant’s vehicle over and Investigator Bat-son testified that he observed the appellant shove the white paper bag between the driver’s seat and the transmission casing.
The trial court indicated during the voir dire examination of Investigator Batson, that the State would not be permitted to introduce any evidence of the statements made by the appellant to Investigator Bat-son while Batson was at the appellant’s apartment. However, the State indicated that it only wished to introduce testimony that Investigator Batson had seen the forged prescription blanks and the list of names, including that of Elizabeth Peoples, when he was previously at the appellant’s apartment.
The evidence that the forged prescription blanks had been previously seen at the appellant’s apartment was essential to the. State’s proof of a prima facie case; i.e. that the appellant obtained, by the forgery or alteration of a prescription, controlled substances. The trial court thereafter allowed Investigator Batson to testify, over defense counsel’s objections, that he had seen a prescription blank with Dr. Dagani’s name on the printed form and made out to Elizabeth Peoples.
Although the appellant consented to tell Investigator Batson about the scheme and method of obtaining the Dilaudid by forged prescriptions and consented to show Investigator Batson the prescriptions and list of names for use in the prescriptions, the State did not meet its burden of proving that the consent was voluntary. Therefore, Investigator Batson should not have been allowed to testify that he had previously observed Dr. Dagani’s prescription blanks with Elizabeth Peoples’s name on them in the appellant’s apartment. *1129 and must be unequivocal, specific, and intelligently given, uncontaminated by any duress and coercion.’ United States v. Williams, 754 F.2d 672, 674-75 (6th Cir.1985). Whether consent is in fact voluntary is ‘a question of fact to be determined from the totality of the circumstances.’ Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973); United States v. Recalde, 761 F.2d 1448, 1453 (10th Cir.1985). Within the totality of the circumstances, there are three specific factors to consider in determining whether the State has sustained its burden of proving that the consent was voluntary.
*1128 “The State carries the burden of proving that consent was given and voluntarily. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). ‘Consent must be proved by clear and positive testimony
*1129 “ ‘In determining the specifics necessary to sustain the burden of showing that consent was voluntary, this court has established a three-tiered analysis. First, there must be clear and positive testimony that the consent was unequivocal and specific. Second, the Government must establish that the consent was given without duress or coercion. Finally, we evaluate those first two standards with the traditional indulgence of the courts against a presumption of waiver of constitutional rights. See United States v. Abbott, 546 F.2d 883, 885 (10th Cir.1977); Villano v. United States, 310 F.2d 680, 684 (10th Cir.1962).’ Recalde, 761 F.2d at 1453.”
Bradley v. State, 494 So.2d 750, 758 (Ala.Cr.App.1985), affirmed, 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). See also Lott v. State, 456 So.2d 857, 859 (Ala.Cr.App.1984); Coots v. State, 434 So.2d 864, 867 (Ala.Cr.App.1983); Whitener v. State, 390 So.2d 1136, 1142 (Ala.Cr.App.1980), cert. denied, 390 So.2d 1145 (Ala.1980).
“[I]f * * * consent is obtained by the use of force or pressure, or where superior authority had any place in the obtaining of the consent, the consent is no consent at all, and the constitutional guarantees against unreasonable searches and seizures have been violated.” Pekar v. United States, 315 F.2d 319 (5th Cir.1963). Thus, in Rueffert v. State, 46 Ala.App. 36, 237 So.2d 520 (1970), an appellant’s consent was held involuntary where it was based upon a police officer’s suggestion that any suspicion as to his possession of marijuana would be cleared and the appellant, who was a serviceman, could be on his way for Vietnam without his records “being flagged.”
The Alabama Supreme Court has recently held a confession to have been inadmissible where the facts indicated that the appellant’s consent to confess was involuntary, based on a police officer’s assurance that the appellant’s responses were for use in the completion of a traffic accident report in' Tennessee and that those responses would not be used against him in any criminal proceeding in Alabama. Ex parte Johnson, 522 So.2d 234 (Ala.1988). Although the police officer in Johnson later testified that he did not recall making that promise to the appellant, the Court concluded that, under the totality of the circumstances, the appellant’s statement to the police officer “was the product of deception, albeit somewhat slight.” Id. at 237. The Court quoted Eakes v. State, 387 So.2d 855, 859 (Ala.Cr.App.1978), for the proposition that “ ‘[i]n order to be admissible a confession must be free and voluntary and cannot be the result of any direct or implied promises, however slight.’ ” Id. at 237.
Similarly, in Ex parte McCary, 528 So.2d 1133 (Ala.1988), the Alabama Supreme Court held the appellant’s confession to have been involuntary where it was based on a police officer’s misrepresentation to the appellant that he was suspected of killing Paul Thibodeaux, a man who was also charged in the offense. The Court stated:
“It is apparent to us that the interrogating officers in this case were trying to get the petitioner to confess to the robbery at Martin’s Mercantile by suggesting to him that Thibodeaux had been killed, the implication being that the petitioner might avoid prosecution for the murder of Thibodeaux if he confessed to the robbery. The State failed to introduce evidence sufficient to show that the *1130 petitioner’s will was not overborne at the time he confessed.”
The Court added, quoting Spano v. New York, 360 U.S. 315, 320, 79 S.Ct. 1202, 1205, 3 L.Ed.2d 1265 (1959):
“ ‘The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals' as from the actual criminals themselves. Accordingly, the actions of the police in obtaining confessions have come under scrutiny in a long series of cases. Those cases suggest that in recent years law enforcement officials have become increasingly aware of the burden which they share, along with our courts, in protecting fundamental rights of our citizenry, including that portion of our citizenry suspected of crime.’ ”
McCary, supra, at 1135.
As to Investigator Batson’s further promise to the appellant that he would inform the district attorney of the appellant’s cooperation, the Alabama Supreme Court has recently held that such a promise may render a confession involuntary. Weeks v. State, 531 So.2d 643 (Ala.1988) (based on the premise that the arresting officer offered to “ ‘give something favorable to him if he [Weeks] would help,’ ” at 644.) “The test for voluntariness is whether, in light of the totality of the circumstances, the government obtained a confession by coercion or improper inducement. The factual inquiry into voluntariness focuses on the conduct of the law enforcement officials.” Project: Fourteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1983-84, 73 Georgetown L.J., 2 (1984) at 382-83. (Footnotes omitted.) “Evidence obtained as a direct result of unconstitutional conduct is subject to exclusion; in addition, the rule reaches evidence later discovered and found to be derived from illegal police conduct, or a ‘fruit of the poisonous tree.’ Id. at 387. (Footnotes omitted.) See also United States v. Alberts, 721 F.2d 636, 639-40 (8th Cir.1983) (suppression of evidence proper when consent to search was involuntary).
Although Investigator Batson’s testimony indicates that the attorney who was representing the appellant at the time the promises were made, had been made aware of those promises, because the record does not indicate that the attorney made any contact with the appellant concerning this matter and, moreover, because the record indicates that the attorney was not present when Investigator Batson telephoned the appellant with these promises, we cannot find that the attorney’s knowledge rendered the appellant’s consent voluntary.
Furthermore, because Investigator Batson’s testimony concerning his previous observation of Dr. Dagani’s prescription blanks with Elizabeth Peoples’s name on them, made at the appellant’s apartment, was the only evidence presented by the State to tie the appellant into the forgery, we cannot hold that. its admission was harmless error. Therefore, the judgment is due to be reversed and the cause remanded.
REVERSED AND REMANDED.
All Judges concur.