**UNITED STATES of America**

v.

**Robert Michael BRONOWSKI and Thomas Theodore Salany.**

**Crim. No. 83–83.**

United States District Court, W.D. Pennsylvania, Pittsburgh Division.

Nov. 28, 1983.

Ryan Kennedy, Pittsburgh, Pa., for U.S.

Lester Nauhaus, Pittsburgh, Pa., for defendant Bronowski.

James Wade, Pittsburgh, Pa., for defendant Salany.

## OPINION

SIMMONS, District Judge.

On March 10, 1983, United States Postal Inspectors received a telephone call from Catherine Corletto who indicated that the defendant Thomas Salany, her nephew, was engaged in the trafficking of stolen United States Treasury checks. Corletto stated that in her absence Salany had come to her residence on March 1, 1983, with three Treasury checks which had been stolen from the Trafford, Pennsylvania area, in an attempt to persuade her to drive him to the bank to negotiate the checks. Corletto's statements were corroborated through another aunt of Salany's, identified as Daisy Smeltz, who informed Postal Inspector Donald Rood that Salany had telephoned Corletto's residence to secure transportation to the bank, but that Corletto was not home to receive Salany's call. Corletto further indicated that Salany stated that he would call her on the first of the following month and, if there were stolen checks available, he would work out a deal with her to split the proceeds received from the negotiation of the checks.

Postal Inspector Rood knew that Corletto had a prior record of stealing Treasury checks and was in fact presently under suspicion for the same activity. Previously, in November of 1982, and again in February of 1983, Corletto had been interviewed by the Postal Inspectors regarding her possible involvement in the theft and negotiation of Treasury checks. When questioned about her motives for providing information regarding Salany's alleged activities, Corletto in essence noted that it was because Salany was using the proceeds received from the stolen checks to support a bad narcotics habit.

On March 14, 1983, Postal Inspector Rood contacted Corletto, who indicated that she had spoken with Salany on March 11, 1983. Corletto stated that Salany had asked her whether she wanted to negotiate stolen checks on April 1, 1983, and informed her that he had stolen and passed three Treasury checks the month before.

On March 18, 1983, Postal Inspector Rood again contacted Corletto. Corletto indicated that Salany had asked her to bring a vehicle and meet him at the Trafford Bridge on April 1, 1983. Further telephone conversations repeated the plan to negotiate stolen checks on April 1, 1983. On March 21, 1983, Postal Inspector Rood was informed by Corletto that on occasions Salany negotiated stolen checks at the Super Duper Market.

A final telephone call on March 28, 1983, confirmed the April 1, 1983 rendezvous. On March 31, 1983, Corletto came to Postal Inspector Rood's office and showed him the automobile that she would be driving on April 1; pictures were taken of the vehicle. Inspector Rood also received a physical description of Salany and a hand drawn map of the area where Corletto was to pick up Salany. The map given the Postal Inspector was verified and shown to be accurate. In addition, Corletto signed a consent form for electronic surveillance.

On April 1, 1983, the Postal Inspectors met with Corletto at the Wall Fire Department in Wall, Pennsylvania. At that time, Corletto was equipped with an electronic tape recorder and her automobile was equipped with an electronic transmitter. Thereafter, Corletto drove to Trafford, Pennsylvania and picked up Salany as prearranged. Although Salany stated that he had no checks at that time, he indicated that he had information as to where he could purchase stolen checks, but informed Corletto that he needed money to purchase the checks.

That entire afternoon Salany and Corletto drove around the Monongahela Valley area, but there was no evidence of trafficking in stolen checks or other illegal activity. However, during this time, Corletto and Salany discussed various forms of criminal activity relating to the theft and negotiation of checks. On several occasions Salany asked Corletto for money.

Salany persuaded Corletto to give him money to allegedly purchase a check. Corletto was never repaid and there was no evidence that the money Salany borrowed from Corletto was used to purchase a stolen check. On April 1, 1983, Corletto and Salany went to no mailboxes nor received any stolen checks while under constant surveillance by the Postal Inspectors. Salany was eventually dropped off by Corletto at his home, indicating that someone was going to bring him some stolen checks. Further surveillance of Salany that day, however, proved fruitless.

On April 13, 1983, Postal Inspector Rood was informed by Corletto that Salany was still planning to deal in stolen Treasury checks. On April 25, Corletto informed Postal Inspector Rood that Salany was planning to steal checks from the same persons that he had stolen from on March 3, 1983, and that he would telephone her at 10:00 a.m. on May 3, 1983, so that she could drive him to cash the stolen checks.

On May 3, 1983, Postal Inspectors arrived at Corletto's residence at 8:00 a.m. An electronic tape recorder was installed on Corletto's telephone and one was installed in her automobile; no transmitter, however, was installed. By 11:00 a.m. Salany had not called Corletto as planned, so Corletto drove to Salany's residence and picked Salany up.

Corletto's vehicle was under observation at various points throughout the day. Eventually, the vehicle was observed with an unknown male occupant who was subsequently identified by Corletto as the defendant Robert Bronowski. At 1:15 p.m. Corletto telephoned the Office of the Postal Inspector and spoke with Inspector Trainor and indicated that she, Salany and Bronowski were going to the Wilkshire Poultry Farm to steal checks. This message was relayed to Inspector Rood and to the surveillance team—Inspectors Leverone and Clinton. The surveillance team was dispatched to the Wilkshire Poultry Farm area where they observed the Corletto vehicle parked near roadside residential mailboxes.

At 2:15 p.m. Corletto again telephoned the Office of the Postal Inspectors and spoke to Inspector Trainor. Corletto informed Inspector Trainor that Salany had stolen a check and that they were going to the Mellon Bank in Turtle Creek, Pennsylvania to negotiate it. Corletto also advised Trainor that the name of the payee on the check was "Kenneth Gaston," that the check had been stolen from McKee Road, and that it was a green government check. This information was relayed to Inspector Rood and the surveillance team.

Upon receipt of this information, the agents proceeded with all dispatch to the Mellon Bank in Turtle Creek where they spotted Corletto standing across the street from the Mellon Bank. Corletto informed Inspector Rood that defendants Bronowski and Salany were in the "drive-thru window" of the bank and that they had both signed the check which had been earlier removed from a mailbox on McKee Road. Postal Inspector Leverone went into the bank and was informed that the occupants of the vehicle were attempting to negotiate a Social Security check payable to "Kenneth Gaston, 700 McKee Road, McKeesport, PA. 15131." The check purported to have the endorsement of "K. Gaston" and also bore the signature of "Robert Bronowski." After the check was tendered, the bank teller made a photocopy of the check which was handed to Inspector Leverone.

The bank officials indicated that they would not honor the check but would return it to the presenters. When Inspector Leverone emerged from the bank he handed the photocopy to Inspectors Rood and Clinton who were waiting in their vehicle. As the defendants were exiting the drive-thru area of the bank, the Postal Inspectors blocked the defendants' exit with their service vehicle. Inspector Leverone approached the Corletto vehicle containing both Bronowski and Salany and observed the check lying between them on the front seat of the automobile. At that point, Inspector Leverone advised defendants Bronowski and Salany that they were under arrest and advised them of their constitutional rights.

At the time of the arrest, the Social Security check made payable to Kenneth Gaston was seized from the front seat of the Corletto vehicle. After the arrest, Salany and Bronowski were taken to the Office of the United States Postal Inspectors, where they were again advised of their constitutional rights. Both defendants gave full statements regarding their involvement in the theft and negotiation of the Treasury check.

## THE DEFENDANTS' MOTIONS TO SUPPRESS ARE DENIED.

In this case the defendants Bronowski and Salany assail the validity of their warrantless arrest. The defendants argue that at the time of their arrest, the Postal Inspectors lacked the requisite probable cause to justify an arrest without a warrant because the government's informant, Catherine Corletto, was unreliable and did not adequately reveal the basis of her knowledge; nor was the Postal Inspectors' independent investigation sufficiently corroborative. For these reasons, the defendants seek to suppress the statements given to the Postal Inspectors and the seizure of physical evidence subsequent to their arrest.

The Supreme Court has consistently expressed a preference for the use of a search warrant where feasible. *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In an attempt to balance the rights of society against the rights of the accused, courts under certain circumstances, however, have allowed arrest without a warrant consonant with the dictates of the Fourth Amendment. To be lawful, a warrantless arrest must be based upon probable cause which must exist on the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed. *See Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

There is not now, nor has there ever been, a precise formula for the determination of probable cause. This is because "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *See Illinois v. Gates*, —— U.S. ——, ——, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527, 544 (1983). Because the heretofore

rigidly followed "two-pronged test" of *Aguilar-Spinelli* has encouraged an excessively technical analysis of probable cause, the Supreme Court has abandoned its application and in its place reaffirmed the "totality of the circumstances" analysis, with an eye toward a more flexible and easily applied standard. *Id.* at ——, 103 S.Ct. at 2332, 76 L.Ed.2d at 548.

■ Under the "totality of the circumstances" formulation of the probable cause standard, the informant's veracity, reliability and basis of knowledge all remain highly relevant determinations. They, however, are not "entirely separate and independent requirements to be rigidly exacted in every case ...," but "should be understood as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is 'probable cause'...." *Id.* at ——, 103 S.Ct. at 2328, 76 L.Ed.2d at 543.

Here the defendants' primary contention is that the government's informant in this case was not reliable. They assert that prior to the date of their arrest, the informant had given the Postal Inspector several pieces of information, all of which had proven to be false.

■ While accurate information obtained from an informant is highly desirable, the Fourth Amendment has "never required that informants used by the police be infallible ...." *Id.* at ——, 103 S.Ct. at 2335, n. 14, 76 L.Ed.2d at 553, n. 14. Probable cause does not demand rigid certainty. For purposes of assessing the informant's reliability, under *Gates* this Court is not required to dissect and analyze isolated instances of inaccuracies, but must weigh the informant's statements against the totality of the circumstances to determine whether there exists a probability or substantial chance of criminal activity.

As earlier indicated, the informant had stated that the defendant Salany would be trafficking in stolen checks on April 1, 1983. In fact, surveillance of Salany on that date failed to uncover any illegal activity. That Salany did not deal in stolen

checks in April, as predicted, is of little consequence in this case. For one thing, future actions of third parties are ordinarily difficult to predict. Moreover, we need not pause to evaluate the informant's erroneous tip in a vacuum because *Gates* requires a "balanced assessment of all the various indicia of reliability ... attending an informant's tip ...." *Id.* at ——, 103 S.Ct. at 2330, 76 L.Ed.2d at 545.

It has been long recognized that in making a warrantless arrest an officer "may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." *Jones v. United States,* 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960); *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). In *Gates,* the Supreme Court acknowledged the probative value of corroboration of details of an informant's tip by independent police work in applying the totality of the circumstances analysis. *Illinois v. Gates,* —— U.S. at ——, 103 S.Ct. at 2333, 76 L.Ed.2d at 550.

The salient facts in this case occurred on May 3, 1983. It is important to note that at 1:30 p.m. on May 3, 1983, after the informant had picked the defendants up in her vehicle, she informed the Postal Inspectors, via telephone, that she and the defendants were going to the Wilkshire Poultry Farm area to steal checks. After this information was relayed to the Postal Inspectors who were keeping the field surveillance, the Corletto vehicle was spotted in the Wilkshire Poultry Farm area, parked near roadside residential mailboxes. Of course, at this point, all that had been corroborated by the Postal Inspectors was entirely innocent conduct.

Notably, however, in March the informant had indicated that Salany had called her and attempted to secure transportation to negotiate stolen checks. This information was corroborated by an independent source. In April, although Salany did not deal in stolen checks as predicted, the infor-

mant and Salany discussed various forms of criminal activity relating to the theft and negotiation of checks. This information was intercepted by the Postal Inspectors through electronic surveillance. Thus, by May 3, 1983, like in the cases of *Jones v. United States,* 362 U.S. at 269–70, 80 S.Ct. at 735–36 and *Ker v. California,* 374 U.S. at 36, 83 S.Ct. at 1631, seemingly innocent activity became suspicious in light of the informant's initial tip and the Postal Inspectors earlier independent investigation. At that juncture, the Postal Inspectors were not obliged to dismiss lightly knowledge gained from their earlier investigation of Salany in March and April. Nor is it reasonable for us to do so now.

Later, at 2:15 p.m. on May 3, 1983, the informant telephoned the Postal Inspectors and advised them that "Salany had stolen a check and that they were going to the Mellon Bank in Turtle Creek to cash it". In addition, she advised the Inspectors that the check was drawn to "Kenneth Gaston, that it had come from McKee Road, and that it was a green, government check." Importantly, the informant's tip contained a range of details relating not just to facts and conditions existing at the time of the tip, but to future actions of the defendants as well. Inherent in the informant's statement was a declaration that the events were personally observed. There is nothing to suggest a reckless or prevaricating tale. More importantly, this case does not involve an anonymous tip, but an informant known to the Inspectors and under their constant surveillance. Thus, "even if we entertain some doubts as to the informant's motive [or reliability, her] explicit and detailed description of the alleged wrongdoing along with a statement that the event was observed first-hand entitles [her] tip to greater weight than might otherwise be the case." *Illinois v. Gates,* — U.S. at —, 103 S.Ct. at 2329, 76 L.Ed.2d at 545.

Prior to making the arrest, the Postal Inspectors personally verified every facet of the information given them by the informant, except whether the Gaston check had in fact been removed from the mailbox. Two individuals, one known to be the de-

fendant Salany and the other identified by the informant as Bronowski, were attempting to negotiate a Treasury check. The check was drawn to the order of Kenneth Gaston at McKee Road, and purported to be endorsed by K. Gaston and countersigned by Robert Bronowski. Surely, with these details being personally verified, the Inspectors had reasonable grounds to believe that the remaining unverified information—that the check had been removed from Gaston's mailbox—was likewise true. *Accord Draper v. United States,* 358 U.S. at 313, 79 S.Ct. at 333.

For these reasons, this Court holds that under the totality of the circumstances the arresting officer could have reasonably concluded that a probability or substantial chance of criminal activity existed. Nothing more is required. The defendants' motions to suppress must therefore be denied.