OPINION
{¶ 1} Defendant-appellant Aaron Turner appeals from his conviction and sentence for Trafficking in Marijuana, following a no-contest plea. Turner contends that the trial court erred by denying his motion to suppress. Turner contends that all evidence should have been suppressed, because the police obtained it as a result of an unlawful detention and arrest and their unlawful intrusion onto private property without a warrant. Because the evidence was seized while Turner was parked in an alley upon a third person's property, we conclude that Turner had no reasonable expectation of privacy. Therefore, Turner's Fourth Amendment rights were not violated, and he cannot claim the benefit of the exclusionary rule.
 {¶ 2} The investigatory stop by the detectives was warranted, because there was a reasonable articulable suspicion that Turner was engaged in illegal drug activity, based on the totality of the circumstances. We also conclude that Turner's arrest was lawful. It is undisputed that Turner was arrested after the marijuana, which was seized within constitutional limitations, was found on and around Turner. The police were presented with evidence from which a reasonably prudent person might conclude that Turner had committed a crime, so the police had probable cause to arrest Turner.
 {¶ 3} Turner also contends that his statements, made in response to custodial interrogation, should be suppressed, because he did not make a knowing, voluntary and intelligent waiver of his rights and the statements were a product of unlawful detention and arrest. We previously concluded that the detectives had reasonable and articulable suspicion to make an investigative stop, and that Turner's arrest was lawful. We also conclude that Turner's statements are admissible, because he made a knowing, voluntary and intelligent waiver of his rights. The record shows uncontradicted evidence that Turner understood his rights before making his incriminating statements. The record does not demonstrate that Turner made his statements as a result of police coercion, and the totality of the circumstances demonstrate that Turner voluntarily gave his statements to the police.
 {¶ 4} Therefore, we conclude that the trial court did not err in overruling Turner's motion to suppress. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 5} One evening in August, 2002, Detective Kevin Phillips and Detective David House of the Dayton Police Department, Street Crimes Bureau, were in the Delphi Chassis parking lot conducting a surveillance operation of an area across the street featuring a B.P. gas station, a Wendy's, an Econo Lodge, and a McDonald's. At approximately 7:45 p.m., the detectives observed a black Mercury Cougar drive through an access road, past three pay phones that the officers knew did not receive incoming calls, to a pay phone at the B.P. gas station that did receive incoming calls. The detectives observed no activity around the Mercury for approximately ten minutes; then the car pulled up slightly, and the backseat passenger picked up the pay phone receiver, without dialing, talked and then hung up, about ten seconds after having picked up the receiver. The Mercury then pulled out and traveled west on Edwin C. Moses Boulevard and turned north onto Cincinnati Street. The detectives, dressed in plain clothes and driving in an unmarked vehicle, followed the Mercury about a quarter of a mile from the B.P. gas station to an alley behind 788 Edgemont Avenue, where the Mercury parked in front of an already parked, gray Oldsmobile Allero. The detectives also observed a blue Pontiac Bonneville pass their vehicle and pull in beside the Mercury and in front of the Oldsmobile in the alley. The detectives observed at least two people in the Oldsmobile, two people in the Pontiac, and three people in the Mercury. The detectives drove past the vehicles and then contacted Detective Gavin Larrimore and Sergeant Harold Perry for assistance.
 {¶ 6} The four officers met down the street from 788 Edgemont Avenue to formulate a plan to make contact with the vehicles. Detective Larrimore and Sergeant Perry then drove down the alley to approach the vehicles, and Detective Phillips and Detective House drove down the street and approached on foot from the front of the house at 788 Edgemont Avenue. Approaching the Oldsmobile with his gun drawn, Detective House advanced towards the driver's side of the vehicle, and observed, through the rolled down driver's side window, a plastic bag of marijuana in the lap of the driver, Tyrone Manley. Detective Phillips advanced towards the passenger side of the Oldsmobile and observed, through the rolled down passenger side window, a plastic bag of marijuana in the lap of the front-seat passenger, Aaron Turner. The detectives also observed a digital scale on the middle console between Turner and Manley. A third passenger was in the back seat on the passenger side, and the detectives ordered the three passengers to show their hands. The detectives escorted the passengers from the vehicle and handcuffed them.
 {¶ 7} Detective Phillips advised Turner and Manley of their rights under Miranda v. Arizona (1966), 384 U.S. 436. Detective Phillips then questioned Turner. Turner stated that the marijuana was his and Manley's, and that they were only there to smoke the marijuana. Manley admitted that the scale was his. Detective Phillips then searched Turner and found approximately $2,500 in cash, but did not find any drug paraphernalia, which might have included lighters, matches or rolling papers. In addition to the thirty grams of marijuana Turner had on his lap, two bags of marijuana, containing approximately twenty grams and fifteen grams, respectively, were recovered from the floorboard by Turner's feet, and approximately two grams of marijuana was recovered from his shorts pocket.
 {¶ 8} Manley informed Detective House that he lived at 788 Edgemont Avenue. Detective House then made contact with the resident of 788 Edgemont Avenue, Joan Hagans, Manley's mother. After Detective House informed Hagans of what had transpired in the alley, he asked Hagans if he could check the area where Manley stayed to ensure that there were no drugs present. Hagans signed a Consent to Search Form. Hagans then showed the officers the bedroom Manley stayed in, when he stayed at the residence, and the officers searched the bedroom. A bag of marijuana was recovered from a dresser drawer, and a safe was recovered from a closet in the bedroom. The safe was opened with a key and keypad combination, supplied by Manley, and the safe contained marijuana, crack cocaine, and cash. The detectives did not have a search warrant or an arrest warrant.
 {¶ 9} Turner and Manley were subsequently arrested, but the remaining occupants of the vehicles were allowed to leave the area and were not arrested. Turner was indicted on one count of Trafficking in Marijuana, in violation of R.C. 2925.03(A). Thereafter, Turner filed a motion to suppress. After a hearing, the trial court overruled Turner's motion to suppress, concluding that Turner had no standing to have evidence suppressed based on an illegal search of Hagans's property, because he had no reasonable expectation of privacy on her property, in which he had no ownership interest. The trial court found that Turner had no reasonable expectation of privacy in the alley adjacent to Hagans's property, because of its accessibility. The trial court also found that the police had reasonable suspicion to make an investigatory stop, and that Turner's arrest was lawful. Turner then entered a plea of no contest, was found guilty, and was subsequently sentenced to five years of community control. Turner was also assessed court costs and a supervision fine.
 {¶ 10} From his conviction and sentence, Turner appeals.
 II {¶ 11} Turner's sole Assignment of Error is as follows:
 {¶ 12} "The trial court erred in overruling appellant's motion to suppress evidence."
 {¶ 13} Turner first contends that "[a]ll evidence should be excluded because the police obtained it as a result of their unlawful intrusion onto private residential property without a warrant." Turner argues that the police conducted an illegal search, because probable cause and exigent circumstances did not exist to enter the private property. Turner also argues that a reasonable suspicion of criminal activity did not exist to warrant an investigatory stop based on the totality of the circumstances. Specifically, Turner contends that the stop was not justified, because the conduct observed by the police was consistent with innocent activity.
 {¶ 14} Turner then contends that "[a]ll evidence should be excluded because it was obtained as the result of an unlawful detention and arrest by police on private residential property without the benefit of a warrant." Turner argues that probable cause did not exist for his arrest, and that his arrest was unlawful, because the search was illegal. Turner further argues that the search of Hagans's home was illegal, because her consent was not valid, since she was coerced by the police into signing the Consent to Search Form.
 {¶ 15} "Fourth Amendment rights are personal rights. Thus a person alleging as error the introduction of evidence seized during an allegedly illegal search bears the burden of showing that he has reasonable expectation of privacy in the property seized. A person meets this burden only by establishing (1) a manifested subjective expectation of privacy in the object of the challenged search, and (2) that society is prepared to recognize that expectation as legitimate. A reasonable expectation of privacy does not exist when the property which the defendant seeks to suppress is seized from a third party. As noted in Brown v. Illinois
(1973), 411 U.S. 223, 230, `Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.' Thus, as a matter of constitutional law, a person charged with a crime of possession has no legitimate Fourth Amendment privacy interest in contraband seized during the search of a third party." State v.Spencer, Montgomery App. No. 11740, 1990 WL 68957, at *2 (internal citations omitted). "`Defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have been violated.' When a defendant is aggrieved by an allegedly illegal search of a third party's property, the Fourth Amendment rights of that defendant have not been infringed." Id. at *3 (internal citations omitted).
 {¶ 16} Applying these standards, we conclude that Turner has no standing to have the evidence suppressed. The police discovered the evidence after entering Hagans's property. Turner has no ownership interest in Hagans's property. Because the evidence was seized on a third person's property, Turner has no protected privacy interests that were violated by the police. The location of the stop, search and seizure — an automobile parked in an alley at the edge of private property — did not afford Turner a reasonable expectation of privacy. We conclude that Turner has no reasonable expectation of privacy on Hagans's property, and therefore, Turner's Fourth Amendment rights have not been infringed. Since Turner's Fourth Amendment rights were not violated, he cannot claim the benefit of the exclusionary rule.
 {¶ 17} The investigatory stop by the detectives was warranted, because there was a reasonable articulable suspicion that Turner was engaged in illegal drug activity based upon the totality of the circumstances.
 {¶ 18} "In order to conduct an investigative stop of a vehicle, the police officer must `be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.' Terry v. Ohio (1968), 392 U.S. 1, 21,88 S.Ct. 1868, 1880, 20 L.Ed.2d 889. The Ohio Supreme Court has found that `[t]he propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances.'State v. Bobo (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph one of the syllabus. These circumstances must be considered `through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.' State v. Andrews (1991), 57 Ohio St.3d 86,87-88, 565 N.E.2d 1271. For this reason, the court must take into consideration the officer's experience and training and understand how the situation would have been viewed by the officer on the street. Id. at 88, 565 N.E.2d 1271." State v. White, Montgomery App. No. 18731, 2002-Ohio-262, 2002 WL 63294, at *2. "[T]he Supreme Court has held that, while a series of events appear innocent when viewed separately, taken together, they can warrant further investigation. United States v.Sokolow (1989), 490 U.S. 1, 9-10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1. A reasonable and articulable suspicion to stop for further investigation requires something less than probable cause. Terry, supra at 22,88 S.Ct. at 1880." Id.
 {¶ 19} The record shows that the detectives had reasonable suspicion to make an investigative stop. Detective Phillips had approximately seven years of experience, and Detective House had approximately five years of experience, with drug investigations. Detective Phillips and Detective House had conducted surveillance operations in the area of the 2100 block of Edwin C. Moses Boulevard for approximately two and a half years, resulting in over one hundred arrests of persons for drug possession, trafficking in drugs, or weapons-related offenses. All of the arrests involved activity near the pay phones in the parking lots of the four businesses, B.P. gas station, Wendy's, Econo Lodge, or McDonald's, that closely resembled the activity observed in this case.
 {¶ 20} Detective Phillips and Detective House testified that there are three common scenarios of drug transactions in the area. Detective Phillips and Detective House testified that one scenario involves a car pulling up to use a pay phone to make contact, and then leaving the area to go to a more secluded location to complete a drug transaction. The detectives both testified that this scenario fit the facts of this case. The detectives observed the Mercury take the access way to the B.P. station and drive past three pay phones, which they knew did not receive incoming calls, to a pay phone that did receive incoming calls. The detectives observed the Mercury remain by the pay phone for ten minutes before the back-seat passenger picked up the receiver for approximately ten seconds, without dialing, talked and then hung up. During the ten minutes they were waiting, none of the occupants of the Mercury left the vehicle to conduct business in the B.P. gas station. After using the pay phone, the Mercury immediately left the area, drove to an alley behind 788 Edgemont Avenue and parked in front of the already parked Oldsmobile. Thereafter, the detectives observed the Pontiac pull in beside the Mercury in front of the Oldsmobile. The most logical reason for the vehicles to be parked facing each other was to act as "lookouts."
 {¶ 21} Based on the experience of the detectives, we conclude that they could recognize a series of events that would likely constitute a drug transaction. Again, "while a series of events appear innocent when viewed separately, taken together, they can warrant further investigation." White, at *2 (citation omitted). In viewing the totality of the circumstances, we conclude that the detectives had reasonable and articulable suspicion to make an investigative stop.
 {¶ 22} In addition, we conclude that Turner's arrest was lawful. It is undisputed that Turner was arrested after the marijuana, which was seized within constitutional limitations, was found on and around Turner. The police were presented with evidence from which a reasonably prudent person might conclude that Turner had committed a crime; therefore, the police had probable cause to arrest Turner. See, Spencer,
supra at *2 (citing Draper v. U.S. (1959), 358 U.S. 307, 79 S.Ct. 329,3 L.Ed.2d 327).
 {¶ 23} Turner also contends that "[a]ll incriminating statements appellant made in response to police interrogation while in custody should be suppressed as a product of unlawful detention and arrest and because appellant did not knowingly, voluntarily and intelligently make the comments." Turner argues that his incriminating statements should be excluded as evidence, because they were the fruits of an illegal search and unlawful arrest. Although Turner concedes that the police read him his Miranda rights, he argues that he did nothing to indicate to the police that he understood or waived his rights, but merely acquiesced to the show of authority by the police.
 {¶ 24} Based on our above analysis, Turner's statements should not be suppressed as a product of an unlawful detention and arrest, because the detectives had reasonable and articulable suspicion to make an investigative stop and Turner's arrest was lawful. In addition, Turner's statements are admissible, because he made a knowing, voluntary and intelligent waiver of his rights.
 {¶ 25} "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege." Miranda, 384 U.S. at 478-479. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Id. at 444.
 {¶ 26} "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said inMiranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." North Carolina v. Butler
(1979), 441 U.S. 369, 373. "Where a suspect speaks freely to policeafter acknowledging that he understands his rights, a court may infer that the suspect implicitly waived his rights." State v. Murphy,91 Ohio St.3d 516, 519, 2001-Ohio-112, 747 N.E.2d 765.
 {¶ 27} In this case, Detective Phillips testified as follows:
 {¶ 28} "A. * * * I advised, uh . . . Turner and Manley or their — their rights [sic]. They both understood their rights.
 {¶ 29} "They were, uh . . . cooperative. I, uh, . . . questioned them about the — marijuana, that of which . . .
 {¶ 30} "Q. Okay. You said you read their rights. What did exactly did you say to them [sic]?
 {¶ 31} "A. Uh . . . I advised them of their — their rights, uh . . . their right to an attorney, uh . . . off [sic] the, uh . . . — the Rights Warning Card supplied by your office. Uh . . . both of them understood and were coherent, uh . . . that they, uh . . . understood their rights.
 {¶ 32} "Q. Okay. You advised them they had the right to remain silent?
 {¶ 33} "A. Yes, Ma'am.
 {¶ 34} "Q. And that they had the right to an attorney?
 {¶ 35} "A. Yes, Ma'am.
 {¶ 36} "Q. And that they didn't have to talk to you unless they wanted to?
 {¶ 37} "A. Yes, Ma'am.
• * *
 {¶ 38} "Q. And did — what'd they say when you read these rights to them?
 {¶ 39} "A. Uh . . . I began ask — asking them questions.
 {¶ 40} "Q. But they — what'd they say when you were reading their rights to them?
 {¶ 41} "A. I didn't get a specific answer from them, uh . . . and — but the again, as I stated, they were coherent and, uh . . ., uh . . . cooperative, lookin' at me, uh . . . as they were read to them.
 {¶ 42} "Q. Okay. And then you — you asked them questions?
 {¶ 43} "A. I asked a, uh . . . general question, uh . . . mainly toward, uh . . . the passenger, uh . . . Mr. Turner . . .
 {¶ 44} "Q. Mmm Hmm.
 {¶ 45} "A. . . . in reference to the weed where he stated that, uh . . ., uh . . . it was theirs and that they were only there to smoke a little bit.
 {¶ 46} "Q. Okay. Did Mr. Turner make any statements?
 {¶ 47} "A. Uh . . . he did, and that's the statement that he — he had made about just smoking a little weed."
 {¶ 48} The record shows that Detective Phillips read Turner hisMiranda rights from the Rights Warning Card. The record also shows that Detective Phillips's testimony is uncontradicted evidence that Turner understood his rights before making his incriminating statements.
 {¶ 49} Turner also contends that his statements were not voluntary, and that he merely acquiesced to the show of authority by the police.
 {¶ 50} "An accused may voluntarily waive the Fifth Amendment right against self-incrimination. `A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct.'" State v. Sapp, Clark App. No. 99 CA 84, 2002-Ohio-6863, at ¶ 47 (citation omitted). "Whether a confession is voluntary depends upon `the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" Id. at ¶ 49 (citation omitted).
 {¶ 51} On cross-examination, Detective Phillips testified as follows:
 {¶ 52} "Q. * * * When you approached, uh . . . the, uh . . . — the Oldsmobile, were your guns drawn?
 {¶ 53} "A. Mine was, yes sir.
 {¶ 54} "* * *
 {¶ 55} "Q. All right. Uh . . . and I assume in customary fashion and policy of the department, when you approached the vehicle and, uh . . . looked in, you were very cautious?
 {¶ 56} "A. That is correct, sir.
 {¶ 57} "Q. And your voice to freeze or to hold still or whatever, I'm sure would be in a forceful manner.
 {¶ 58} "A. That is correct, sir.
 {¶ 59} "Q. Okay. Uh . . . that would be consistent with the policy that applies to all officers on the scene in such a situation?
 {¶ 60} "A. That would be correct, sir."
 {¶ 61} There is nothing in this record to establish coercive police conduct. The totality of the circumstances demonstrate that Turner voluntarily gave his statements to the police; therefore, his statements should not be suppressed.
 {¶ 62} We conclude that the trial court did not err in overruling Turner's motion to suppress. Turner's sole Assignment of Error is overruled.
 III {¶ 63} Turner's sole Assignment of Error having been overruled, the judgment of the trial court is affirmed.
Grady and Young, JJ., concur.